QUEEN CITY FURNITURE AND CARPET COMPANY v. CRAWFORD *et al.*, *Appellants.*

### Division One, March 12, 1895.

1. **Corporation, Filing Articles of:** STATUTE. Corporate existence becomes complete, under the statutes of this state, when the articles of association are filed in the office of the secretary of state. (R. S. 1889, sec. 2769.)

2. **Contract:** PRINCIPAL: AGENT. A contract by an agent is the contract of the principal, provided the former acts in the name of the principal, and in such case the principal, and not the agent, is bound by the contract.

3. ———: ———: ———. The agent is, however, personally bound where the principal is not known, or exceeds his powers, or where the agent contracts in his own name.

4. ———: CORPORATION: PARTNERS. Persons associated to form a corporation, but who contract with third persons in advance of such formation, may be held liable to the latter as partners.

5. ———: ———: RATIFICATION. The ratification by a corporation of a contract, made before its existence, is equivalent to the execution of an original contract.

6. **Appellate Practice:** ESTOPPEL. An appellant will not be heard to complain that an issue made by his answer was submitted to the jury.

*Appeal from Greene Circuit Court.*—HON. JAS. T. NEVILLE, Judge.

AFFIRMED.

*T. J. Delaney* for appellants.

(1) The petition declares upon an express contract made by and between the plaintiff and the defendants,

and upon this theory must recover.   It can not recover, on the theory of implied contract raised by law, because the defendant corporation had no legal existence.   If plaintiffs intended to rely upon the latter theory, the facts should have been pleaded.  *Dougherty v. Matthews*, 35 Mo. 520;  *Waldhier v. Railroad*, 71 Mo. 514;  *Faulkner v. Faulkner*, 73 Mo. 327;  *Bank v. Campbell*, 34 Mo. App. 45;  *Reed v. Bott*, 100 Mo. 62.   This is not merely a variance, but it is a failure of proof.   (2) In support of the allegations of the petition that defendants contracted for the goods and agreed to pay therefor, Mr. Eckas denied all knowledge of the Cleveland Building Building Company, and denied all knowledge of the various agreements amongst the defendants introduced in evidence, and testified positively that defendants personally purchased.   This was met by the positive denial of each defendant, and their testimony justified the giving of refused instructions numbers 3 and 4. For the same reason instruction number 2, given at the request of plaintiff, should have been refused.   See cases cited *supra*.   (3) For the same reason all the evidence tending to show a failure to incorporate the . Cleveland Building Company in order to raise an implied liability against the defendants was incompetent, irrelevant and immaterial.   Cases cited *supra*. (4) The court erred in refusing to give instructions number 11, 13, 14.   The evidence offered by the defendants clearly shows that the defects in the corportion were made known to the plaintiff and that plaintiff, by and through its agent, agreed to furnish the goods and look to such corporation, when legally organized, for payment.   (5) The court admitted the evidence tending to prove these facts and then refused to instruct the jury thereon.   These facts as between plaintiff and defendants constitute an estoppel.   All the elements of estoppel are present.   By treating the

corporation as having a legal existence, and agreeing to look to it for payment, plaintiff induced the defendants to receive the goods in behalf of such *de facto* corporation, and it is inequitable for plaintiff to now hold defendants personally liable on the theory that no such corporation existed at that date.

*Massey & Tatlow* and *G. M. Sebree* for respondent.

Persons intending to organize a corporation, and who contract before its formation, are personally liable on such contracts. *Hunt v. Salisbury*, 55 Mo. 312; *Richardson v. Pitts*, 71 Mo. 128; *Martin v. Terrall*, 79 Mo. 401; *Smith v. Warden*, 86 Mo. 382; *Granby Mining Co. v. Richards*, 95 Mo. 108.

ROBINSON, J.—This is a suit against defendants doing business as the Baldwin Theater House Company, to recover the sum of $3,078.04 for carpets, curtains, etc., furnished during December, 1891. The petition is in two counts, the first as aforesaid, and the second for certain goods which were ordered and defendants had failed to receive.

The so-called abstract of appellants is seriously defective; it does not even set out the motion for new trial, nor is the answer of but one defendant set out and that is the separate answer of defendant Crawford, and that, to the original petition filed, and not to the amended one on which the issues were finally submitted, and trial had.

The defendants are Crawford, Davis, Parker and Keyser. It seems that the [defendants conceived a scheme of building and furnishing an opera house in Springfield and that the citizens of that place raised a bonus to purchase a suitable lot therefor, and that one Baldwin, of Cleveland, agreed to loan defendants

$20,527.80 to assist in carrying out the scheme. In July, 1891, an agreement was made between Baldwin as party of the first part, Seth Tuttle, as trustee, party of the second part, and Parker, Keyser and Davis, parties of the third part. This agreement set out the fact that Baldwin was willing to aid the parties of the third part financially in building an opera house upon a certain lot therein described and said parties agreed to convey said lot to Tuttle, as trustee, and Baldwin agreed to assign to the trustee for the use of the trust therein declared, all subscription notes and premiums of every kind given in aid of the proposed opera house and also to pay the sum of $20,527.80 upon the execution and delivery of a bond by the trustees in the sum of $30,000, and together with four promissory notes each for $5,131.95, in favor of Baldwin. The bond was to secure the faithful performance of the trust, and the subscription and premiums and the amount loaned by Baldwin were to be used by the trustee in paying off certain amounts remaining due upon the real estate, and expend the remainder in the construction of the proposed opera house. The trustee was to accept and hold the property to the use of the parties of the third part, and after the expenditure of moneys in his charge as aforesaid was to convey it to said parties of the third part, upon demand, as their interest might appear, in accordance with a contract between them and the trustee. (This contract was modified in November, 1891, in some respects not shown by the record, but at any rate fixed the interests of the parties.)

It provides for the organization of a corporation with a capital stock of one thousand, two hundred and fifty shares; one hundred and twenty-two shares to be held by T. J. Delaney, as trustee, and the remainder divided between Crawford, Parker, Keyser, Davis and Tuttle; the trust was to be continued for two years,

unless sooner revoked by any three of the four persons, Crawford, Davis, Keyser and Parker—and Delaney, as trustee, was in the meantime to vote his holdings for the best interests of the proposed corporation. The contract also names the first board of directors of the proposed corporation, which were to be Keyser, Parker, Crawford, Davis and Baldwin. Keyser was to be the manager of the proposed corporation and of the offices and opera house building. "All legitimate expenses incurred in the organization and promotion of this enterprise shall be paid by the parties in interest and shall be a part of the cost of said building," to quote the language of the agreement.

F. C. Eckas, secretary and manager of plaintiff, identified the bill of goods sold; said, further, that he understood the opera house was to be furnished, and so he went to Mr. Crawford and asked him about it, and Mr. Crawford directed him to Keyser, who would tell him about the plans and specifications, and informing him at the time, if Keyser did not give him satisfaction, to return to him; and, further, "You make out your bid, bring it to me and give it to no one else."

"I gave it to him and he said he would look it over, and if our prices and goods were as good, or equal, to anybody else, he would give us the preference. When I got my samples I got Mr. Crawford, Keyser, Parker and Davis to look at them. I called on Crawford next day and he showed me a list that he had made out himself of the number of carpets. Mr. Davis and Mr. Parker came to the store and gave us the numbers that Crawford selected, and I ordered from the numbers. The draperies were selected by Davis, Parker and Keyser. They also decided to take the chairs. Parker and Davis ordered the chairs; Keyser ordered the mirrors. The prices are the prices agreed upon, and, where not agreed upon, prices are reasonable. The damages

claimed are for carpets cut to fit the opera house, and which can't be used elsewhere. The goods were to be paid for on delivery, December 26, and thirty days after, one half at each time. The carpets I kept, and which were not delivered, was because they said to me after the carpets had been cut out and prepared and ready to be fitted on the floor, it was no account of theirs, and that if I placed same in theater, then I must look to the theater company for my money.

"After Crawford, Davis and Parker first selected the goods, I asked about the money. This was in the bank; Parker was setting at his desk and Crawford was just going out, and I asked him who we were to look to for the money, and I never asked anybody but him, and he said, 'The money is here and is all right; you need not worry about the money—I will see that you get the money.' Parker was there. I do not know whether he heard the remark or not. Crawford did not say anything about the corporation at that time, and I didn't know about there being a corporation. Our bill is $3,078.04. This includes not delivered, amounting to $450.67, and on the latter I am damaged $225. The bill is made out to Baldwin Theatre. I asked Keyser afterward what the name of the corporation was going to be, and he said he thought it would be 'Baldwin.' Goods were charged on our books to Baldwin Theatre. I was not told by defendants that goods were to be charged to Cleveland Building Company. I did not ask Crawford and Parker to guarantee payment. Crawford and Parker were the only ones present when the order was made."

Thomas Coulon, contractor, who built the opera house, testified that he built it under contract with Seth Tuttle, trustee for Baldwin, Keyser, Davis, Crawford and Parker; that Keyser gave him an estimate. Tuttle gave him a check and Crawford cashed it. A copy

of the contract between Coulon and Tuttle was introduced in evidence; it was objected to because a copy, and as irrelevant and immaterial at that time as offered, and the objection should have been sustained, but the error can not change the result as our remarks will hereafter show.   Tuttle, trustee, identified the notes we have referred to, which were signed by Parker, Davis, Keyser, Tuttle and Crawford.

Keyser and Crawford testified that the goods were purchased for the Cleveland Building Company, and understood by plaintiff.   The bid made by plaintiff was addressed to Crawford, and is dated November 19, 1891. On November 25, 1891, the word "accepted" was written thereon by Parker, who signed his name thereunder, and Davis and Keyser also signed at the same time.   Parker testified that Crawford, Keyser and himself were the four for whom Tuttle acted as trustee, and also for Baldwin on account of the loan made by Baldwin.   Parker further testified that he and his three associates had held various meetings as directors of the Cleveland Building Company.   This was under some defective articles of association, which were abandoned, and a new start made in January, 1892, and the secretary of state issued his certificate on January 6, 1892.

These four men held meetings as directors under the defective articles even after they had been advised that the same were defective.   The old corporation, that is, the first one, had no stock book and no record book and no stock was ever issued; the only record kept was a blotter upon which memoranda were made and some notations on loose sheets of paper.   Parker testified that little attention was paid to such things; and there is no positive proof that the so-called corporation ever had a seal.   After the receipt of the articles from the secretary of state in January, 1892, the opera house and real estate was conveyed to the

Cleveland Building Company. None of the parties ever paid anything upon their stock subscribed for by them in said company.

From the evidence above set out, it is clear that these four parties had associated themselves together to carry out this enterprise; that an attempt was made to organize the Cleveland Building Company in 1891, but it was a very weak attempt; so weak, in fact, the parties themselves thought but little of its legality, though they continued to hold so-called director's meetings, but had no stock book, no record book and corporate seal and no certificate from the secretary of state. The goods sued for were delivered in 1891 by plaintiff under a bid addressed to Crawford and accepted by Davis, Parker and Keyser in writing. True, Crawford objected to this acceptance as not showing acceptance by him but his connection with the enterprise as one of the moving spirits had theretofore been conclusively established, and his three associates in accepting the bid acted for him as well as themselves; he knew of the purchase of the goods and their delivery; knew to whom credit was being given and certainly knew that there was no such corporation in existence as the Cleveland Building Company.

The truth is, the whole transaction was with defendants as individuals and not as agents of a principal disclosed or undisclosed, for there was no principal except themselves—nor was there any contract made by the Cleveland Building Company with plaintiff. Said company was not organized till January 6, 1892, and all its property afterwards acquired was the real estate and opera house and the furniture, carpets, etc., placed therein by plaintiff. None of the organizers paid for any of the stock subscribed by them. Certainly the corporation could not contract

for the carpets and furniture, etc., furnished by plaintiff under such circumstances.

The legal questions are, we think, plain enough. Corporate existence becomes complete, under our statute, when the articles of association are filed in the office of the secretary of state. *Hurt v. Salisbury*, 55 Mo. 310.

In actions brought against persons associated together, assuming to act as a corporation, it is perhaps immaterial whether they are called partners or not. *Richardson v. Pitts*, 71 Mo. 128.

Every contract made by an agent of a business in relation to the business of the agency is a contract with the principal, provided the agent acts in the name of the principal, and in such cases the latter and not the former is bound. The agent, however, is personally bound where the principal is not known, or where there is no responsible principal, or where the agent becomes liable by an undertaking in his own name, or where he exceeds his power. 2 Kent's Comm. *630; *Blakely v. Bennecke*, 59 Mo. 193; *Fay v. Richmond*, 18 Mo. App. 362.

Under the facts disclosed in this case, the corporation had no existence; there was simply an immatured intention of the parties to form a corporation. Under the authorities cited, there being no responsible principal, the associated parties must be held liable as partners. *Smith v. Warden*, 86 Mo. 399; *Martin v. Fewell*, 79 Mo. 411.

Strictly speaking, there can be no ratification by a corporation of a contract formed by its promoters prior to the completion of the corporate organization. The so-called ratification by the corporation is nothing more nor less than the making of an original contract. The fact that the corporation makes the same contract theretofore made by its promoters, does not constitute

a ratification but it is an original contract of the corporation. This is plainly so, for the reason that there was no corporation in existence at the time these promoters made the contract in question, and the corporation, in the so-called adoption of the contract of its promoters, is simply (as we said before) acting in the same way as it would act in entering into any other engagement. This so-called adoption need not be shown by express acts, but may be proven by acquiescence, as any other original contract might be shown.

But, even when a corporation *de facto* becomes *de jure* and makes a contract of its own which theretofore had been entered into by its promoters, the promoters are not thereby relieved from the burdens of their own contract, for the plaintiff may elect whether he will hold the corporation or the promoters, unless he had agreed in the first instance to look to the corporation alone, and the corporation has assumed the liability. 1 Beach on Private Corporations, sec. 159.

Now the facts in this case show that at the time the contract was made by the promoters, there was no corporation in existence. They show further that the requests to the plaintiff to put in bids for the furnishing of the goods and materials desired were made by the defendants individually. The organization, therefore, or lack of organization of the corporation afterward brought into existence can certainly have no bearing, for the important question in the case is to whom was credit given?

The question is very clearly discussed at length in *Heath v. Goslin*, 80 Mo. 314, where the court says: "The controlling question then is, to whom did the plaintiff give the credit, and whom did the defendant understand her to be crediting? If, as a matter of fact, it was so understood by both parties as to become

a part of the contract that the so-called board of re-gents were not to be responsible in any event to this teacher for her agreed wages, they would not be bound, although there was no responsible principal behind them. Enough is shown by the record to conclude that the plaintiff, when she performed the service, knew the origin of this school, and the source from which the board expected its pecuniary sustenance. It is also true that she testified she did not expect the defend-ants individually to pay her. But she further testified, to what would seem to be the plain, common sense idea all the parties must have entertained, that she was employed by the board, and 'expected the board—the defend-ants—would provide the means with which to pay me; I had nothing to do with the matter of raising the money; I did not agree to look to any particular fund or source for funds; the board hired me and agreed to pay me; I supposed they would raise the money in some way; I did not agree to take any pay, or rely on any contingent fund or anything of the sort; they employed me and agreed to pay me, and I looked to them for pay and not to anybody else or any particular fund.'"

Now the evidence is clear in this case, that the contract witn the plaintiffs was made by the trustee, who, as shown by the agreement between the defend-ants, was trustee for all of the defendants in the mat-ter of bringing about the erection and completion of the work, and the furnishing and fitting thereof. Cer-tainly it would work a grievous wrong to plaintiff if parties can put forward a man as trustee acting for them, and know that he is incurring liabilities as such, and upon the faith and credit of the fact that he is such trustee, and acting for them, can obtain credit, and then prevent the payment of just bills by a special and specious plea that he was acting for a supposed

corporation. There is no question of estoppel in the case. The record shows that the parties intended to form a corporation, but it shows also that they did not form a corporation until long after these goods and supplies were furnished. It shows also that the trustee was acting for these defendants, and not for any corporation, because at that time there was no corporation in existence.

Of course, if, at the time this contract was made, it had been by plaintiff with the Cleveland Building Company through Keyser, as manager, and plaintiff supposed that the Building Company was a corporation and that Keyser was its manager and gave credit to the company as a corporation, and no one else, and knew no one else in the transaction but the company and Keyser, then plaintiff could not hold any person for the goods, except Keyser, after ascertaining that there was no such corporation by reason of a failure to obtain a certificate from the secretary of state or to file the articles with the recorder of deeds of the county as if the same was required by law; Keyser would be liable, in any event, as there would be behind him no responsible principal, but the other persons who, unknown to plaintiff, supposed they were stockholders in the abortive corporation would not be liable, for plaintiff did not give them credit and did not know them in the matter—in fact had relied alone upon the company as a corporation and Keyser as its manager. Whether this be based upon estoppel or upon an absence of any contractual relation surely does not change the result.

But this case presents no such features. There was no corporation nor was there any attempt to organize a corporation, nor did anyone pose as an official of a supposed corporation. The transaction was between the plaintiff and the defendants as individuals, up to the time of the making of the contract, when the

trustee steps forward and makes the contract with the plaintiff. Now, manifestly, this trustee was acting both for himself and his associates, and so the uncontradicted evidence proves.

The appellant now contends that, as the petition in this case declared on an express contract, the court erred in submitting instructions touching the liability of defendants on the theory of an implied contract raised by law, because the corporation attempted to be organized by defendants had no legal existence. Appellants introduced that issue in the case by their answer and can not be heard to complain in that the question thus raised was submitted to the jury.

The instructions given are substantially in accordance with the views hereinabove expressed and judgment is affirmed. All concur.