APPEAL OF NEWMAN THEATRE CO.

Docket No. 3694.   Decided July 27, 1926.

Leaseholds valued for invested capital purposes and as a basis for an allowance for depreciation.

*Perry W. Shrader, Esq.,* and *E. J. Dillon, C. P. A.,* for the petitioner.

*A. H. Fast, Esq.,* for the Commissioner.

Before STERNHAGEN, LANSDON, and ARUNDELL.

The Commissioner has determined a deficiency in income and profits taxes for the calendar year 1920 in the amount of $11,158.05. The deficiency arises from the exclusion from invested capital of $350,000, alleged to be the value of certain leaseholds assigned to the corporation by one of its stockholders, and from the consequent refusal of the Commissioner to allow depreciation on the leaseholds.

FINDINGS OF FACT.

The petitioner was incorporated under the laws of Missouri on August 9, 1918, with its principal place of business at Kansas City. The purpose was to construct and operate a motion-picture theatre. Frank L. Newman, the promoter of the enterprise and the president, manager and chief stockholder in the corporation, came to Kansas City in 1913 and immediately engaged in the operation of motion-picture houses. He organized the Royal Theatre Co. and the Regent Theatre Co. and was their president and manager. The same persons who were associated with him in these corporations later were associated with him in the Newman Theatre Co.

In 1915 Newman negotiated a lease on a tract of land on Main Street in Kansas City, Missouri, having a frontage of approximately

24 feet, known as the McGonegal property, which he had T. H. Cochrane take in his own name. The lease so taken was dated November 30, 1915, ran for 99 years from January 1, 1916, and provided for a rental of $12,500 per annum and the payment of all taxes, special assessments and other public levies. The rental of this property for a period of 2½ years was paid by the Royal Theatre Co. This lease was assigned to Newman on June 12, 1918, and by the latter to the petitioner on March 1, 1919.

Under date of May 15, 1918, Newman secured a lease for a period of 99 years from May 1, 1918, on the property immediately adjoining the McGonegal property, which property had a frontage on Main Street of substantially the same width. By the terms of the agreement Newman was to pay an annual rental of $12,960 and all taxes, special assessments and other levies. This lease was on what is known as the Turner property. On March 1, 1919, Newman assigned the Turner lease to the petitioner.

Newman also secured a lease on the Brady property, immediately adjoining the Turner property, with a frontage of approximately 48 feet on Main Street. This lease was for a term of 99 years from May 1, 1918, and provided for a rental of $35,000 for the first 20 years and thereafter a rental of $40,000, the lessee to pay all taxes, special assessments and other public levies. On March 1, 1919, this lease was assigned to the petitioner.

The purpose of Newman had been to secure a lease of property on Main Street, having a frontage of 50 feet, on which to erect and operate a motion-picture theatre. To that end the McGonegal tract was leased in 1915, the lease being taken in the name of Cochrane. Difficulties were encountered, however, in securing the adjoining tract owned by Turner, and it was not until 1918 that a lease was secured. The original plans did not contemplate the lease of the Brady property. This was made possible solely because the building thereon was destroyed by fire, thus affording an opportunity for the acquisition of the lease which was taken.

Newman took all the steps necessary to secure these leases and acted on his own initiative, although there was an informal understanding between him and his associates that the leases would be turned over to a corporation thereafter to be organized for the purpose of constructing and operating a motion-picture theatre should that course be later determined on. The restrictions of the Government incident to the World War made difficult the securing of certain building materials and lent uncertainty to the carrying out of the plans, and it was understood between the several interested parties that, should it become impracticable to erect the theatre, Newman would retain the leases and proceed with his own plans. It was

his intention, in that event, to erect business buildings on the property. Some money was expended by Newman in securing the leases and also in starting the building of the theatre, the latter expenditure being incurred prior to the incorporation of the petitioner but after a charter had been applied for.

The authorized issue of common stock of the petitioner was $550,000, divided into shares of the par value of $100 each. By April 22, 1919, there had been paid in by the stockholders in cash approximately $157,000. All advances made by Newman in securing the leases and in construction of the building were credited to his stock account and stock was issued against the same. At the stockholders' meeting of April 22, 1919, there was voted to Newman stock in the amount of $25,000, in recognition of his efforts on behalf of the corporation. Three shares of stock were issued for each share paid for and, in determining the amount to be received by Newman, the stock voted to him was treated as if purchased. After the issuance of the stock on the basis of three shares for one, Newman held 2,250 shares, T. H. Cochrane 845 shares, J. G. L. Harvey, secretary of the company, 600 shares, and others in less amount.

The leases were valued by the company at $350,000 and this valuation was the principal basis for the issuance of stock in an amount in excess of the cash paid in.

The fair market value of the three leases when turned in to the corporation on March 1, 1919, was $140,000.

### OPINION.

ARUNDELL: We are satisfied from the evidence that the leases acquired by Newman were his individual property until such time as they were turned over by him to petitioner. It is true there was an informal understanding between Newman and his associates that the leases would be turned in to a theatre company thereafter to be organized, should that course prove desirable, but the record does not disclose any formal or binding agreement to that end, and in fact it was clearly understood, should the theatre project not be carried through, that Newman would proceed in his own way to develop the leases. This being true, the company would be entitled to take the leases into its invested capital, assuming that they had a value when paid in to it by Newman, and as stock was not issued directly for the leases, they would form a part of petitioner's paid-in surplus. At the time the leases were acquired no steps looking to the organization and incorporation of petitioner had been undertaken and it was then uncertain whether a company would ever be organized and a theatre built.

The authorities are not uniform as to the relationship which a promoter bears to a corporation organized by him. The rule in Missouri, where petitioner was incorporated and where it operates, is that a promoter can not be an agent of a corporation not then in existence. *Reynolds* v. *Title Guaranty Trust Co.* (Mo. 1916), 189 S. W. 33. The United States Supreme Court has stated, however, in the case of *Dickerman* v. *Northern Trust Co.*, 176 U. S. 181, 204, that, " The promoter is the agent of the corporation and subject to the disabilities of an ordinary agent."

In many jurisdictions a corporation may ratify the acts of its promoters, though the rule appears to be to the contrary in Missouri. The Supreme Court of that State, in the case of *Queen City Furniture & Carpet Co.* v. *Crawford*, 30 S. W. 163, states:

Strictly speaking, there can be no ratification by a corporation of a contract formed by its promoters prior to the completion of the corporate organization. The so-called " ratification " by the corporation is nothing more nor less than the making of an original contract. * * * This is plainly so for the reason that there was no corporation in existence at the time these promoters made the contract in question * * *.

The several decisions examined by us are directed rather to the right of the promoter to make secret profits and to the right of the corporation to secure the benefits of contracts made by promoters in its behalf, and not to a state of facts such as we have here. On the facts before us we have no hesitancy in reaching the conclusion that petitioner is entitled to include in its invested capital the value of the leases.

We are left then to determine the value of the leases at the time they were turned in to petitioner on March 1, 1919. The evidence establishes to our mind that the rental exacted for the Brady lease represented the full rental value of the property and that the lease has no bonus value. On the contrary, we believe that the Turner and McGonegal leases had a distinct value on March 1, 1919. The three assembled leases when turned in to petitioner we have found to be of a fair market value of $140,000, and its invested capital should reflect that value. This amount should also be used as a basis for an annual deduction for depreciation.

*Order of redetermination will be entered on 15 days' notice, under Rule 50.*

PHILLIPS dissents, on the ground that the transaction involves section 331 of the Revenue Act of 1918.