C. T. DARLING ET AL., Appellants, v. CHARLES A. BUDDY ET AL.
—1 S. W. (2d) 163.

Division One, December 30, 1927.

*Charles H. Mayer* and *Floyd M. Sprague* for appellant.

*W. B. Norris, W. M. Morton* and *Culver, Phillip & Voorhees* for respondents.

LINDSAY, C.—This is a suit in equity, based upon the provisions of an agreement designated as a "Syndicate Agreement," to which plaintiffs and defendants and some other persons were parties. The purpose is to have an accounting, and to require contribution by defendants to plaintiffs, on account of payment by plaintiffs of two judgments obtained against plaintiffs, for an indebtedness contracted by the syndicate managers. The agreement is as follows:

"Syndicate Agreement.

"This agreement, made this 12th day of August, 1909, by and between Hilon A. Parker, Amos F. Cutter, George H. Boynton, Eugene W. Boynton, and Stephen S. Brown, hereinafter designated the Syndicate Managers, parties of the first part, and the several subscribers hereto, each of whom is hereinafter termed the Syndicate Subscriber, parties of the second part, and all of whom, both parties of the first and second part, constitute the syndicate and are so designated herein, Witnesseth:

"That whereas the Syndicate Managers have purchased the entire capital stock of the Muscatine North & South Railway Company having a line of railroad now complete and in operation from the city of Muscatine, in the State of Iowa, to a connection with the Iowa Central Railway at and near the station of Elrick, in Louisa County, in said State, a distance of twenty-eight and seven-tenths miles, with all its property, rights, privileges, and franchises of every kind and description; and

"Whereas in the opinion of the Syndicate Managers the said railroad should be immediately extended to and into the city of Burlington, in the State of Iowa, which extension would greatly increase its business, enhance its value, and bring great profit to its owners; and

"Whereas the purchase price of said stock, the payment of indebtedness of the company and the expenditures necessary to put

the road and equipment in good condition will amount to about two hundred and twenty-five thousand dollars and it is desirable to have a further sum provided to be used if necessary to meet any emergency that may arise in relation to the acquisition of terminals and other property for the purpose of such extension or otherwise, so that it is expedient to provide the sum as shall be necessary for such purpose, to secure which the parties desire to form a syndicate to advance the same or so much thereof as shall be necessary to accomplish said objects:

"Now, therefore, in consideration of the premises, and of the mutual promises herein contained to be kept and performed by the several parties hereto, the said parties hereby promise and agree to and with each other as follows:

"First. They hereby form a syndicate, to be called the Muscatine North & South Syndicate, for the purpose of acquiring the railroad and property of every kind and description of the said Muscatine North & South Railway Company, and of improving, extending, equipping, operating, merging, controlling and disposing of the same as the syndicate managers shall determine to be for the best interests and profit of the said syndicate.

"Second. Each syndicate subscriber hereto, including any counterpart thereof, all of which are the parts of one and the same instrument, has set opposite to his name the amount of his subscription and such subscription and all the provisions of this agreement shall take effect and become operative and binding at the election of the syndicate managers when such subscription of solvent persons shall amount, in the aggregate, to two hundred and twenty-five thousand dollars ($225,000) and shall take effect absolutely and without such election when they shall amount, in the aggregate, to three hundred thousand dollars ($300,000). In no case shall subscriptions be received to a greater amount than three hundred thousand dollars ($300,000).

"Third. Each syndicate subscriber promises and agrees for himself and independently of the action of any other subscriber to pay in cash upon call of the syndicate managers on account of his subscription thereto and upon five days' written notice by mail of such call, such amount as shall be named in such call; provided, however, that the first call shall not exceed fifty per cent of such subscription, and subsequent calls shall not exceed twenty per cent of such subscription, and no call shall be made within less than one month of the call which last preceded it. All such payments shall be made to the German Trust Company of Davenport, Iowa, for the account of the syndicate managers. At the time of receiving such payment the said Trust Company shall issue and deliver to the subscribers a certificate therefor, setting forth, among other things, the amount of such payment and the date of the call under which it was made, which shall be transferable only by surrender to the Trust Company, and the issue by it of

a new certificate in the name of the transferee. The payment so made and certified shall be the measure of the interest of such subscriber in the syndicate. If any subscriber shall refuse or fail to pay any such call the syndicate managers may, at their option, to be exercised in writing, cancel such subscription, and in such event such subscriber shall be excluded from further participation in the syndicate except to the extent of certificates held by him, and other subscribers may be received by the syndicate managers for the interest so forfeited. Otherwise the subscriber so defaulting shall remain liable in all respects upon his subscription as provided herein. The failure of any syndicate subscriber to perform any undertaking or duty hereunder shall not release or affect any other syndicate subscriber.

"Fourth: The said syndicate managers may fill any vacancy which shall occur in their body. They may act by a majority of the quorum present at any meeting in all things within their authority, and may organize by the appointment of officers having such powers as may be implied by the names of their respective offices or be otherwise granted to them and may appoint such other officers and agents as in their opinion may be necessary to the transaction of the business. They shall proceed without unnecessary delay and with reasonable diligence to acquire the property, rights and franchises hereinbefore mentioned, and shall manage the same for and in the interest of the syndicate as fully to all intents and purposes as if they were the owners thereof; shall vote and otherwise handle as owners all stock acquired by them hereunder; may add to and extend the said railroad; may organize and incorporate such other corporations as they shall think necessary or desirable to acquire, construct, take over, or hold any property herein contemplated; may cause to be issued and acquire the stocks, bonds and other securities of any such corporation or corporations; may borrow money for such purposes and pledge any or all of the property and syndicate subscriptions in their hands to secure the payment thereof; and may sell and dispose of any or all the property so held by them whenever in their opinion it will be for the best interest of the syndicate.

"Fifth. The syndicate managers shall have the sole direction, management, and conduct of the syndicate, and the enumeration of particular or specific powers in this agreement shall not be considered as limiting the general power and discretion hereby intended to be conferred upon them so as to authorize them to do any and all things necessary and expedient, in their discretion, to carry out the purposes of this agreement, nor shall they or any of them be liable under any of the provisions of this agreement, or in or for any matter connected therewith, except for want of good faith and failure to exercise reasonable diligence; and the syndicate subscribers severally hereby irrevocably nominate, constitute and appoint the syndicate

managers, their agents and attorneys to do and perform all things deemed by them necessary and expedient to the carrying out of all the purposes of this contract in its full intent and meaning.

"Sixth. Nothing contained in this agreement or otherwise, shall constitute the syndicate subscribers partners of the syndicate managers, or of one another, or render them liable to contribute for any purpose more than their ratable amount as herein defined and provided, or entitle them to any participation in the results or profits of said syndicate other than as herein specified. Nor shall the failure of any syndicate subscriber to perform any of his undertakings hereunder affect or release any other syndicate subscriber.

"Seventh. Unless sooner terminated by the syndicate managers in their discretion and upon notice to the syndicate subscribers this agreement shall continue in force and operation for the period of two years from and after the 12th day of August, 1909, and for such period thereafter as the syndicate managers in their discretion find reasonably necessary or advisable in the interests of the syndicate subscribers. The syndicate managers may, however, in their discretion from time to time during the term of this agreement, distribute among the syndicate subscribers in proportion to their several rights and interest as herein defined, any stocks, bonds, or other securities, or cash, which may have accrued from the sale or capitalization of any of the syndicate properties or securities in their hands, and upon the expiration of this contract all moneys and securities then remaining in the hands of the syndicate managers shall, after payment of all lawful claims and indebtedness against the syndicate or syndicate managers, be distributed as herein provided.

"Eighth. The expenses of the syndicate managers made by them in connection with the carrying out of the purposes of this agreement shall be a charge against the syndicate and payable out of its funds. The syndicate managers shall be allowed as compensation for their services one-third of the net profits, if any, resulting from the transactions herein contemplated and provided, after returning to the subscribers or their assignees money paid by them as shown by the trust company's certificates. The remaining two-thirds of any such profits shall be divided *pro rata* among the holders of such certificates. Should there be a loss it shall be borne *pro rata* by the syndicate subscribers to the extent of their several subscriptions and no farther. The syndicate managers may, if they desire, become syndicate subscribers also, and to the extent of such subscription by them, they shall participate in profits and losses in all respects as other subscribers.

"Ninth. The holding of certificates issued by said trust company shall constitute such holders parties to this agreement as fully, to all intents and purposes, as if signing the same.

"Tenth. All notices issued by the syndicate managers hereunder shall be mailed to the addresses of subscribers as given below opposite their respective names, and such making shall constitute valid service.

"Eleventh. This agreement shall bind and benefit ratably, according to the amount of the several subscriptions, not only the parties hereto, but their respective successors, survivors, assigns, legal representatives. An original hereof is to be signed by the syndicate managers and deposited with the trust company, and counterparts may be signed by the syndicate subscribers and retained by the syndicate managers, and all shall be taken and deemed one original instrument.

"In witness whereof, the syndicate managers, parties of the first part, have subscribed an original hereof, and the syndicate subscribers, parties of the second part, have subscribed said original or counterparts thereof, as of the day and year first above written."

The plaintiffs in their petition alleged that by the agreement the parties "united in a joint adventure," and pleaded the terms of the agreement; alleged that the syndicate managers were empowered to borrow money for the operation of the railroad mentioned, and for such purpose did borrow $20,000 from the Hershey State Bank of Muscatine, Iowa, for which two notes of $10,000 each were given to the said bank. It alleges, the nonpayment of the notes; the insolvency of the syndicate; the bringing of the suits in Iowa, in each of which some of the plaintiffs were made defendants; the obtaining of judgments by the bank, and the payment of those judgments by the plaintiffs.

The petition alleges that all of the subscribers to the syndicate agreement by reason thereof, "became and were partners and cosureties for the Muscatine North & South Syndicate, and became jointly and severally liable for the pecuniary obligations of the syndicate." The answers filed by the respondents set up, a general denial; a denial under oath of the relation of partnership between them and the plaintiffs; a misjoinder of parties plaintiff, alleging that plaintiffs did not pay the judgments jointly or from a joint fund, and that their remedy was several and not joint; a non-joinder of necessary parties defendant; and, as to the executors named, that the action has not been revived within one or two years from the date of issuance of letters testamentary.

There was no allegation in the petition, nor was there any evidence, that any of the defendants held themselves out to the Hershey State Bank as partners. It is not alleged, but it is claimed by the plaintiffs to be a fact, that the Hershey State Bank, at the time it accepted the two notes, was ignorant of the terms of the syndicate agreement. The evidence in the record is that the syndicate managers held the stock of the railway company, and through such holding controlled the operation of the railway and made the extension referred to in the

agreement; that the railway company was indebted to the Hershey State Bank in the sum of $20,000 and was unable to pay the same; that the two notes for $10,000 each, on which the judgments were taken, were notes given by the "Muscatine North & South Syndicate," executed by its president and secretary, and were taken by the bank in satisfaction of the indebtedness of the railway company.

The trial court's ruling in favor of defendants, it is stated, was based upon a finding that the agreement created a common-law trust.

There was some oral testimony to which a brief reference is made. In the transaction of giving and taking the notes of the syndicate in satisfaction of the notes of the railway company, Mr. Cutter, one of the syndicate managers, and its secretary, was the only person dealing on behalf of the managers, with the bank. The president and cashier testified that Cutter said it was not a corporation, and he "thought" it was a partnership, and "thought" he was himself liable for the payment of the notes. It is not shown that the officials of the bank or Mr. Jayne, who was vice-president of the bank and its attorney, and also attorney for the railway company, saw a copy of the agreement, or called for it. Mr. Jayne had died before the trial of the suit on the notes, and all that is shown is, that the president and cashier referred the question of liability to him; that he had a list of the names of the persons interested in the syndicate, but it was not shown whether he ever saw the agreement or not. At any rate, the testimony tends to show that he, or his associates in his law office, made an investigation, and he was of the opinion that the persons interested were bound as partners. However, we do not understand counsel for plaintiff to rely upon what was stated in the transaction, but that they rely upon the terms of the agreement itself. It is clear the agreement does not meet the tests required to constitute the relation of co-partners. The tests are set forth in the opinion in National Bank of Commerce v. Francis, 296 Mo. 169 and cases there cited.

That was a case wherein bondholders of a railroad company purchased the road at foreclosure sale, appointed a reorganization committee to act for them and entered into an agreement for a reorganization, and to secure funds to pay that part of the purchase price of the railroad necessary to be paid to the other bondholders not parties to the agreement, and also to pay for extending the road. Among other things, the reorganization agreement provided for a construction company, to construct the extension. The reorganization committee and the bondholders issued some notes in the name of the Allegheny Improvement Company, and the plaintiff in that suit signed a subscription agreement to buy and did buy those notes. The Allegheny Improvement Company was a name and the company did not in fact exist. The suit of the plaintiff was against the bondholders, plaintiff alleging that the Improvement Company was the agent of the bondholders, and that by the reorganization agreement they were partners

and liable as such upon the notes. In the agreement subscribed by bondholders, toward the reorganization fund, there was the following provision: "Nothing herein contained or otherwise shall constitute the subscribers partners, nor render any of them liable as under contract or otherwise except for the due proportion subscribed by him." The reorganization agreement contained the provision that "all profits made by such construction company shall, under proper contract to be made by the committee, be paid to the committee for the benefit of holders of certificates of interest."

The terms of the contract in that case pertinent to the question of liability of the bondholders to third persons are much like those found in this case. Under the uniform rulings of this court governing the relation of partners, it was held that it was not sufficient to create a partnership *inter sese,* that the parties were to share profits in a given enterprise or transaction, but they must also have *agreed* that they *intended* to share the losses and become partners; that the mere participation in the profits without intention to become partners and share losses will not make them partners as between themselves. It was further held "as equally well established law that third parties cannot hold persons liable as partners unless they are partners in fact and *inter sese,* except upon the ground of estoppel in cases where they have held themselves out as partners, and the plaintiff has acted upon such holding out." A further rule was stated, l. c. 194: "Except where the third party makes his case by reason of the alleged partner holding himself out as such, the question of partnership is the same as between the parties themselves."

In this case the oral testimony shows that the officers of the bank must have assumed that the persons named in the list given to Mr. Jayne bore some relation to each other and to the "syndicate" with which the bank was dealing. They did not have even the assurance of Cutter that those persons were partners, but, as they say, only his statement that he thought they were partners and were bound. This was enough to put the officials upon inquiry as to what the relation was, and as to what authority Cutter had. [National Bank of Commerce v. Francis, 296 Mo. l. c. 195.]

The agreement in this case shows that the subscribers did not intend to create a partnership as between themselves. Their intention to the contrary, is plainly expressed in paragraph 6 of the agreement. It is equally clear that while they intended to share profits realized and ascertained by the syndicate managers, they were not intending to share losses, beyond the loss of what they subscribed. This is particularly shown by paragraph 8 of the agreement. In the Francis case the subscription agreement, signed by the plaintiff, made reference to the reorganization agreement, and was held to have put plaintiff upon inquiry as to the terms of the reorganization agreement, but

irrespective of that, there was applied the rule that third parties cannot hold persons liable as partners unless they are partners in fact and *inter sese,* except on the ground of estoppel, in cases where they have held themselves out as partners and the plaintiff has acted upon such holding out.

In the reply brief of counsel for appellants it is conceded that the "agreement did not create an ordinary partnership," but the contention is that the individual liability of the subscribers for the debts of the syndicate resulted as a matter of law upon the execution of the agreement, and that such individual liability is the same as that of ordinary partners, and, .whether the agreement created a joint adventure, or a joint stock company, or a corporation, under either view, the subscribers, as a matter of law, were liable as if an ordinary partnership had been created.

The real controversy, the one emphasized by counsel, is, whether the agreement created a common-law trust. The agreement does not contain the word "trust" or "trustees," but the fact that these specific words are not used, does not of itself determine the question whether the agreement created a trust and is a declaration of trust. The intention of the parties is to be ascertained from the whole of the contract—from the actual.relations it created—and not from the fact that the parties use the words "syndicate" or "syndicate managers" and do not in express words, denominate the instrument a trust agreement, and that the parties occupying the actual relation of trustees, are called syndicate managers. "No special form of words is necessary to create an express trust. In a word, then, an express trust is one which defines and limits the uses and purposes to which certain property shall be devoted and defines the duties of the trustees as to its control, management and disposition." [Heil v. Heil, 184 Mo. l. c. 676.] Under the terms of this agreement the title to the entire capital stock of the railway company was in the five persons designated as "syndicate managers," and to them was paid and in them was also vested title to the moneys paid by the several subscribers. Under this agreement, after such payment, the syndicate managers, holding title to all of the property, were authorized to use it according to their own judgment and discretion for the general purpose outlined in the agreement, and the subscribers had no control either of the property, or over the syndicate managers. The syndicate managers were to select their own successors. The subscribers had no power to fill any vacancy, or to remove any manager, or to direct or control the syndicate managers in any way. There was no association provided for between the subscribers, nor provision for any meeting of them to be held for any purpose, nor any power to amend the terms of the agreement. They had no voice in determining how long the syndicate should continue. The syndicate

managers alone had the power to terminate the contract at any time prior to August 12, 1911, and they alone had the power to continue it as long thereafter as they deemed necessary. The effect of this agreement was that the syndicate managers by title and complete control, were the masters of the property, and the subscribers had nothing other than an interest or right, measured by the amount of these several advancements, to share in the profits, if any, or in the property remaining, if any, upon the closing of the enterprise by the managers. Counsel for defendants contend that the express intention of the syndicate subscribers was that the syndicate managers were merely to be their agents conducting a business enterprise. In support of this contention they call attention to the language of the agreement found in paragraph 5, wherein it is agreed that "the syndicate subscribers severally and irrevocably nominate, constitute and appoint the syndicate managers, their agents and attorneys, to do and perform all things by them necessary and expedient to the carrying out of all purposes of this contract." If the agreement created a partnership, the syndicate managers were agents, and not trustees. But, the syndicate managers, as such, were to make contracts for themselves, and their power to do this was irrevocable, and not subject to direction.

When all the provisions of the agreement are considered, it must be held that the agreement does not create either a partnership or the relation of principal and agent. When it is seen as here, that the title, possession and the management of the property is given to the syndicate managers to hold and to manage free from the control of the subscribers who have a beneficial interest therein, the persons so having the title, possession and control, become the masters by whatever name they be designated. A trustee is a principal and not an agent in his management and control of the property committed to him. [Sears, Trust Estates as Business Companies (2 Ed.) secs. 81-88, and cases there cited; Taylor v. Davis, 110 U. S. 330; Betts v. Hackathorn, 159 Ark. 621.]

There is made on behalf of plaintiffs the contention that the subscribers united in a joint adventure, and the petition contains that allegation. The nature of a joint adventure so far as it may be defined, in its likeness or character of a partnership, and its variance from a partnership, may be found discussed in 33 Corpus Juris, 839-874. But, in undertaking to attribute to this agreement the character of a joint adventure, there again arises the question of control. A rule applicable to the case in hand is stated as follows: "The fact that the contract provides for a sharing of the profits, while an important feature in determining the character of the contract, does not of itself make it one of joint adventure. There must be something more, some active participation in the enterprise; some control over

the subject-matter thereof, or property engaged therein.'' [33 C. J. 847, sec. 16.

There is no plea that the agreement constituted a joint-stock company or a corporation, but it is insisted in argument that if it was not an ordinary partnership, it was a joint adventure or a joint-stock company or a corporation. The argument proceeds upon the theory that it is one or the other. The assumption that it is a partnership and is a joint adventure, is a denial that it is a corporation or a joint-stock company. In State ex rel. Home Savings Institution v. Lee, 288 Mo. l. c. 698, it is said: ''The declaration that it is a corporation is a solemn negation that it is a partnership, or a joint-stock company, or a bond investment company. The pleas are inconsistent and self-destructive.''

That the agreement created a common-law trust and that the subscriber, or members, were not liable for the payment of a debt, created by the managers, is sustained by the greater weight of authority. [Mayo v. Moritz, 151 Mass. 481; Jones v. Gould, 103 N. E. (N. Y.) 721; Williams v. Inhabitants of Milton, 102 N. E. (Mass.) 355; Betts v. Hackathorn, 252 S. W. (Ark.) 602; R. I. Hospital Trust Co. v. Copeland, 98 Atl. (R. I.) 273; Smith v. Anderson, 15 Ch. Div. (Eng.) 247; Home Lumber Co. v. Hopkins, 107 Kan. 190; Crocker v. Malley, 249 U. S. 223; Hamilton v. Young, 225 Pac. (Kan.) 1045; Wells-Stone Merc. Co. v. Grover, 75 N. W. (N. D.) 911; Rice v. Rockefeller, 134 N. Y. 174; Johnson v. Lewis, 6 Fed. 27.] By these authorities also it is ruled that the true test to determine whether the syndicate or organization formed by the agreement, was a trust, or a partnership, is one of control by the managers or trustees, and not merely of investment by the subscribers. [Hamilton v. Young, supra, 225 Pac. l. c. 1046; Sears, Trust Estates as Business Companies (2 Ed.) secs. 81-88. See also Annotation, 7 A. L. R. 612, 10 A. L. R. 887; Annotation to Home Lumber Co. v. Hopkins, supra, 31 A. L. R. 851; Annotation to Betts v. Hackathorn, supra, 35 A. L. R. 502; Annotation to Hamilton v. Young, supra, 46 A. L. R. 169, Annotation.]

Counsel for plaintiffs in their reply brief concede that the rule as laid down by the courts of Massachusetts, Rhode Island and Arkansas is against their contention. They assert that the later decisions of Kentucky, Florida, Louisiana and Texas establish what is the better rule—that the subscribers, or certificate-holders, in syndicate or trust agreements, are liable to third persons for the debt incurred by the managers, notwithstanding the agreement provided they were not to be liable. Ing v. Liberty National Bank, 287 S. W. (Ky.) 960, is cited; but, in that case, as the opinion shows, there were meetings of the shareholders from time to time. It is also shown, page 961, that the note, of which the note sued on was a renewal, was authorized at a meeting of the members. Apparently from what is said, the

members were regarded as owning the property, and at meetings held from time to time controlled the policies to be pursued by the directors. In American National Bank v. Reclamation Oil Assn., 101 So. 10, the members of the trust agreement were held liable as partners. The terms of the agreement are not set forth. There is nothing to show whether by the agreement the entire control was vested in the trustees, or not. In Willey v. W. J. Hoggson Corp., 106 So. 408, it was said: "The trustees had the power to acquire, hold and dispose of the property of any kind, and to invest and reinvest the proceeds thereof." It was held that "such association was nothing more than a co-partnership, or a joint stock company, in which the members are jointly and severally liable." In the Texas case, Thompson v. Schmitt, 274 S. W. 554, it was held that the mere express delegation to certain members of a voluntary commercial association of exclusive control over the common property, was insufficient of itself to convert into a trust what would otherwise be a joint stock company with the members subject to the liability of partners.

The Texas cases are not wholly in harmony with each other. In Davis v. Hudgins, 225 S. W. 73, a similar agreement was held to create a trust, and not a partnership or joint-stock company. Other later Texas cases are cited and discussed in the annotations heretofore mentioned (116 A. L. R. 169). Many of the cases cited in the briefs of counsel, and in the annotations referred to, are cases where the issue was whether the syndicate or trust was within the provisions of laws concerning taxation. Hecht v. Malley, 265 U. S. 144, is an illustration. The law under consideration there was an income tax law. In some of the cases, the question of service of process was the issue; or, that a note executed under the name of the trust by its president and secretay, as such, bound the trustees. Hamilton v. Young, 225 Pac. 1045 was of the latter kind. The Kansas court in that case in the course of the discussion said, at page 1046: "When persons merely furnish capital for an active business enterprise to trustees who have full legal title and absolute management and control, this court is unable to see that they should be held personally liable to creditors who have direct resort to the trust estate any more than holders of corporate stock entitled to dividends out of profits should be personally liable to creditors."

As a discussion of the question of responsibility of the trustees themselves we quote from the opinion in Betts v. Hackathorn, 252 S. W. 604: "A general rule in the law of trusts is that a trustee is a principal and not an agent for the *cestui que trust*. It follows from this rule that the trustee and not the *cestui que trust* is personally responsible for an indebtedness growing out of transactions in relation to the trust estate. The creditor's guaranty is the personal liability of the

trustee. We see no reason why the trustees here should be exempt from this general rule. Their declaration exempting them from personal liability cannot prevent individual liability from attaching as the law fixes the liability of trustees. According to the declaration, they are self-appointed trustees, with absolute authority over.the trust business and property. The rule announced above is supported by the decided weight of authority as will be seen by reference to the list of cases cited on page 46 of Sears on Trust Estates. It was said by the Supreme Court of the United States in the case of Taylor v. Davis, 110 U. S. 330, 4 Sup. Ct. 147, 28 L. Ed. 163, that: 'When a trustee contracts as such, unless he is bound no one is bound, as he has no principal. The trust estate cannot promise, the contract is therefore the personal undertaking of the trustee. . . . If a trustee contracting for the benefit of a trust wants to protect himself from individual liability on the contract, he must stipulate that he is not to be . . . responsible, but that the other party is to look solely to the trust estate.' The trustees under the terms of the indenture interposed themselves as a shield between the stockholders and creditors, and for that reason are individually liable.'' Following the foregoing, the court upon the question of liability of the shareholdes, continued: ''The declaration not only exempts the shareholders from individual liability in specific terms, but shears them of all control and management of the business. Paragraph 9 of the indenture makes the trustees absolute masters of the property and business. The only right accorded to the holders of certificates of stock is to share in profits or dividends. They are in the attitude of one lending money to a partnership for a share of the profits in lieu of interest. A reading of the trust instrument in its entirety has convinced us that the shareholders are not associated with each other and the trustees for the purpose of conducting a business in person or through agents for a profit. There is nothing in the instrument showing an intention on the part of the shareholders to enter into a co-partnership or an intention on the part of the trustees to co-operate with the shareholders in the conduct of the.business. The test, after all, in determining whether a business is a partnership, is to ascertain whether the parties intended one.''

It is urged that the attempted limitation of liability on the part of the syndicate subscribers, without complying with any incorporation or limited partnership statutes, is invalid, because contrary to the express legislative policy of this State, as expressed in Section 11, Article 12, of the Constitution, and Chapter 90, Revised Statutes 1919, concerning Corporations, and Sections 9237-9249 concerning Limited Partnerships. Many cases from other states are cited, among them some heretofore mentioned. Among the Missouri cases cited are Richardson v. Pitts, 71 Mo. 128, and Martin v. Fewell, 79 Mo. 401.

In both of these cases the parties associated themselves for the purpose of forming a corporation, but did not incorporate. In the meantime, they instituted and carried on the projected business and through agents selected by them, incurred indebtedness for which they were held liable. They were the owners of the property, and as individuals, no incorporation having been effected, managed the property through their selected agents, in the incurring of the indebtedness. In these cases the parties, failing to incorporate, created no responsible principal other than themselves, and necessarily themselves remained principals and liable as such. [Furniture Co. v. Crawford, 127 Mo. 364.] In Hurt v. Salisbury, 55 Mo. 310, directors selected by signers of articles of incorporation which were never filed with the Secretary of State—the final step necessary—who executed a note as directors of the assumed corporation, were held to have made themselves liable. Since the final step in incorporation was not taken, the corporation had no power to issue the note sued on. In Booth v. Scott, 276 Mo. 1, citizens of Missouri organized a corporation under the laws of Arizona and never secured a certificate authorizing such corporation, as a foreign corporation, to do business in this State. They were held liable as partners under the provisions of Section 3039, Revised Statutes 1909. In all of these cases there had been created no responsible principal, and if the individuals managing affairs and contracting liability were not liable, no one was liable. In the case at bar, there was created a body, the syndicate managers, who held title to the property, and had exclusive control of it, and of the transactions affecting it, and who, in that capacity, incurred indebtedness of themselves.

The constitutional provision defining the word corporation is as follows: "The term *corporation,* as used in this article, shall be construed to include all joint-stock companies or associations having any powers or privileges not possessed by individuals or partnerships." By this provision the word "corporation" as therein defined does not include all joint-stock companies and associations, but only those "having any powers or privileges not possessed by individuals or partnerships." [Spotswood v. Morris, 12 Idaho, l. c. 374.]

In our view the cases mentioned, and the constitutional and statutory provisions cited, do not apply here to the subscribers who are not associated in the ownership of the property, or in any way in its management or control, since both the title and the property and the control is vested in the syndicate managers.

Upon this question we again refer to what is said in the opinion in Betts v. Hackathorn, supra, l. c. 604:

"Appellee insists that this court is committed to the doctrine that immunity from individual liability to shareholders in a business organization can be accomplished in Arkansas through the medium only of limited partnerships and corporations. In support of this conten-

tion two Arkansas cases are cited in which the court held the members of the organization liable as partners. [Doyle-Kidd Dry Goods Co. v. Kennedy, 154 Ark. 573, 243 S. W. 66; Baker-McGrew Co. v. Union Seed Co., 125 Ark., 146, 188 S. W. 571.] The declaration of trust in each of those cases was quite different from the declaration in the instant case.

"The question as to whether a partnership or strict trust is created by an indenture must depend on the language and provisions of the instrument involved in each case. In the Doyle-Kidd case this court ruled that the instrument created a joint-stock company. There is a marked difference between a joint-stock company and a pure business trust. In a joint-stock company the managers are agents for the shareholders. Not so in a business trust. The managers are principals, and the shareholders are *cestuis que trust.* In the Baker-McGrew case the indenture provided for shareholders to meet and elect trustees. In this way they were in a position to control and manage the business and property. We have not overlooked the case of Greene County v. Smith, 148 Ark. 33. In that case the question of the liability of shareholders to creditors or third persons was not involved; the only question involved being one of taxation. The instrument in the instant case created a pure trust, in so far as appellants P. M. Simms and T. M. Kinser are concerned, and they are immune from individual liability."

Another contention is that the syndicate managers could not be both trustees and *cestuis que trust* of the property at the same time. In support of this the case of Willey v. Hoggson Corporation, supra, is cited; also McCamey v. Hollister Oil Company, 241 S. W. (Tex.) 689. In the latter case, at page 695, the rule was referred to that when both the legal and equitable titles unite in the same person, the trust terminates, but it was also added: "It is also true that the settlor in such a trust ordinarily cannot be a trustee also, although under some circumstances he may occupy the dual relation of settlor and beneficiary or *cestuis que trust.*" In the instant case the managers were subscribers, but we can see no reason under the circumstances here existing why each did not occupy the dual relation as beneficiary to the extent of his individual subscription and trustee as to all others. The beneficial interest of a manager to share in the profits as a subscriber to the fund was not commensurate with his interest as a trustee. Murry v. King, 153 Mo. App. 710-715: "Shareholders, as such, are not incapacitated from being trustee for themselves and others; they may be appointed as trustees without affecting the validity of the trust." [Dunn, Business Trusts, page 167.]

In this action the defendants are not bound by the judgment of the Iowa Court against the plaintiffs. [Strong v. Phoenix Ins. Co., 62 Mo. l. c. 299; Wheelock v. Obershiner, 110 Mo. 107; Robinson v. Seay, 175 Mo. App. 724.]

Under the conclusions heretofore stated, the judgment is affirmed. *Seddon* and *Ellison, CC.,* concur.

PER CURIAM:—The foregoing opinion by LINDSAY, C., is adopted as the opinion of the court. All of the judges concur.