UNITED STATES v. CERTAIN LAND IN WAYNE COUNTY, MO., KNOWN AS TRACT NO. 8, MINGO NATIONAL WILDLIFE REFUGE PROJECT, et al.

No. 492–M.

District Court, E. D. Missouri, S. E. D.

Feb. 28, 1947.

Harry C. Blanton, U. S. Atty., of Sikeston, Mo., and Charles J. Hughes, Asst. U. S. Atty., of St. Louis, Mo., for plaintiff.

Oliver & Oliver and R. B. Oliver III, all of Cape Girardeau, Mo., for intervenor H. A. Luer.

Limbaugh & Limbaugh, of Cape Girardeau, Mo., for intervenor Mrs. Nettie B. Stivers.

Arthur T. Brewster, of St. Louis, Mo., for intervenor Arthur T. Brewster.

HULEN, District Judge.

This is a condemnation proceeding. $5166.66 was paid into court as compensation for a 480 acre tract. It is claimed by each intervenor in whole or part. The Government refers to the land as in the Mingo swamp. Landowners call it Mingo Drainage District. We shall call it Mingo land. A hearing on the respective interests asserted was held and ruling on the rights of the parties in the fund is now before the Court. The intervenors are H. A. Luer, Arthur T. Brewster and Nettie B. Stivers (widow of George W. Stivers). Luer claims the entire fund based on a collector's deed; Nettie B. Stivers by inheritance from her husband, the record owner prior to the tax sale; Brewster claims a one-half interest under an express trust. At the hearing counsel for Luer and Mrs. Stivers announced they had agreed on a settlement of their conflicting claims. The issue is now between Luer and Mrs. Stivers on the one hand and Brewster on the other.

If Luer acquired title by the collector's deed Brewster's claim must fail. We consider the attack on Luer's claim first. Luer purchased the land in November, 1938, for $400. Taxes then due were $344.12. The excess of the bid over the taxes was received by Mrs. Stivers following the death of her husband in 1940. After purchase Luer paid taxes for the years 1938, 1939, 1940, 1941 and 1942 of $791.61. He received a tax deed October 2, 1941. Luer's bid of $400, plus taxes paid to date of receiving the collector's deed, equals approximately $2 per acre for the land. The tax sale is attacked on (1) inadequacy of consideration, (2) sale of more land than necessary to pay delinquent taxes, and (3) defect in notice of sale and collector's deed.

For proof of inadequacy of price Brewster relies upon a stipulation: "If H. A. Luer were present as a witness in this case he would testify that all of the land involved in [this] case * * * was worth $10 or more per acre as of February 12, 1943." This method of making proof is not commended. It deprives the Court of an opportunity to pass upon the credibility of the witness in determining what weight shall be given to his opinion. This we know, Luer had an interest in 1943 in appraising the land at its maximum value in view of the exceptions which had been filed to the Commissioners' report of 1943 and anticipated jury trial to determine value, which took place in 1945. Luer has been before this Court frequently as a witness on the value of Mingo land. Luer's opinion as to values has been uniformly excessive—in many instances grossly so. There is no substantial evidence in the record as to the value of the land in 1938, the time of Luer's purchase at tax sale. The Government's decision to take land by condemnation cannot in law be considered as increasing or lowering the value of such land—in fact it does. The record here indicates the contemplated condemnation proceedings increased the value of land in the Mingo Drainage District. The land is cut over timber, is part of the "Mingo Swamp," and has little or no value except for sale to the Government for a wildlife game refuge. The letter from Mr. Stivers to Brewster in November, 1937, reflects how this land was valued in 1937 and lends support to the Court's opinion that its value at that time was its probable sale to the Government. We quote from the Stivers letter. The first paragraph of the letter describes the tract of land in issue, then proceeds:

"I don't think that we should leave anything undone to get a title to this land even if it reaches the point *where we might have to put up some real money. Wappapello dam seems to be a certainty in my judgment and this land should be valuable*

732

* * * *You understand I am sure that I am not sufficiently interested to redeem. * * *"* (Emphasis added.)

Even with the effect of condemnation proceedings on increase of value Stivers did not value the land to the extent of "redeeming" it, as a speculation. How then can it be said that the price paid by Luer was such as to shock the conscience of the Court? In the condemnation proceeding its value had to be fixed. It was fixed by a jury, on widely divergent opinions as to value, as of 1943. We cannot say the sale of the tract in 1938 at $400 was so grossly inadequate as to evidence fraud.

■■ Complaint that more land was sold than was necessary to pay taxes is also without merit. Section 11128, R.S.Mo. 1939, Mo.R.S.A., which provides for the sale of land in tracts or parcels, specifically provides:

"* * * this section shall be construed directory in character and a failure to comply therewith shall not of itself invalidate any sale."

There is another statute equally fatal to the claims: Section 11177, R.S.Mo.1939, Mo.R.S.A., provides a three-year statute of limitations in suits to "defeat or avoid a sale or conveyance of lands for taxes". In Francis v. Grote, 14 Mo.App. 324, it was held, suits to void tax sales for failure to comply with the statute regarding sale of land in tracts is barred by the applicable statute of limitations.

■■ Brewster questions the notice of sale as failing to comply with Section 11126, R.S.Mo.1939, Mo.R.S.A. We think the particulars on which the notice of sale is criticized are of the same character as the Supreme Court of Missouri had under consideration in Kennen v. McFarling, 350 Mo. 180, 165 S.W.2d 681. The test stated by the Court in the Kennen case is could "* * * anyone * * * have been misled or * * * have misunderstood the purpose of the tax sales or what land was to be sold." (loc. cit. 684)

Brewster does not charge the notices were misleading or that the errors complained of caused anyone to misunderstand the purpose of the tax sale or what land was to be sold. No such attack could be

sustained. It is asserted the deed is defective because not executed "in the name of the state" as required by Section 11149, R. S.Mo.1939, Mo.R.S.A. We have examined the deed and find it to be on form "Approved by State Tax Commission," and substantially in accordance with the statutory form. See Section 11150, R.S.Mo.1939, Mo. R.S.A. The deed recites, in accordance with the statutory form, that it is "between the State of Missouri, by W. E. Short, Collector of said County * * *." The acknowledgment follows the statute verbatim.

We hold the collector's deed offered by Intervenor H. A. Luer valid as against the attack of Intervenor Arthur T. Brewster.

Our conclusions on the validity of the Luer deed make it unnecessary to pass on the remaining issues of "express trust" and laches, but we do so in the interest of a complete record.

Brewster's intervening petition recites only that he is the "equitable owner of an undivided one-half interest" in the land. He testified in his deposition, "Prior to 1923 Mr. Stivers and I bought" the land; he brought two suits to quiet title; the basis of his equitable claim is a letter written by Mr. Stivers dated July 12, 1926. By brief Brewster alleges that by reason of certain letters an "express trust" is established in the land in his favor.

■ Brewster has the burden of proving the express trust alleged. Long v. Conrad, Mo.Sup., 42 S.W.2d 357.

The condemned land was purchased prior to 1923 by Stivers, husband of intervenor. Brewster does not claim he paid any part of the purchase price. The abstract indicates a purchase price of $2.50. That Brewster had an interest in the land from time of purchase we cannot find in view of Brewster's deposition testimony showing lack of knowledge as to how Stivers acquired the land. This leaves only the letters passing from Stivers to Brewster to sustain the claim of express trust.

Certain conclusions follow a careful study of the letters. Brewster and Stivers were speculating in Mingo land. They were interested in a number of Mingo tracts. Brewster is interested in 4,000 acres of land. Brewster represented Stiv-

ers in certain legal matters and was looked to for advice, both on land titles and other subjects.

Brewster urges the Stivers letter of July 12, 1926, as the basis of his claim. This letter refers to a letter from Wammack and Welborn, apparently representing the Mingo Drainage District. The enclosure refers to a suit pending, instituted by the District to quiet title on the tract condemned in this action. Stivers' letter contains this sentence: "Inasmuch as our interest in this matter is identical, I am referring the letter to you and will be guided by any suggestion that you care to make." The subject matter of the letter was a law suit. Brewster claims and this letter confirms his claim that he was attorney for Stivers in the land cases. Stivers' letter does not state that he and Brewster have an identical interest in the *land*. It is not uncommon for a client to tell his attorney that his law suit is a subject of mutual or identical interest. They both want to win. It is possible and probable—although there is no proof of it other than Stivers' reluctance to put money into the Mingo land—that Brewster's compensation would come out of returns from sale of the land. But assuming the statement in this letter is also subject to the inference that Stivers was referring to an interest in lands and not litigation, then the Court is called upon to guess and speculate which of the two inferences to accept.

If the Court should agree with Brewster's contention that title was referred to in the letter of July 12, 1926, then what is to be concluded from the letter of November 20, 1937, the last date of any letter offered by Brewster. The first paragraph of the letter of November 20, 1937, reads:

"In reply to your communication of November 12th having to do with the 400 acres in section 31, twp 27, rge 8 and also the acreage in 30–27–8."

The land description is that of the land condemned in this case. What Brewster said to Stivers in the letter of "November 12th" we can only guess, but the last paragraph of the Stivers' letter ("Are you still carrying any of your land in my name. If so give me the descriptions so that I won't inadvertently sell you out.") in answer to it excludes any reference to a joint interest in the condemned land.

By a further reference to the Stivers' letter of November 20th we find Stivers negativing knowledge of having any title to the land condemned ("I don't think that we should leave anything undone to get a title to this land even if it reaches the point where we might have to put up some real money.") and this must be in answer to comment on the subject in the Brewster letter of November 12th to Stivers. Finally, the Stivers letter contains a paragraph indicating not that Stivers was holding title jointly with Brewster to Mingo land but that each owned complete tracts and so dealt with the land.

"I have no idea what tracts in which I had an interest you bought at the sale the other day. I am in the unfortunate position of not knowing just what I own and don't own. While I dislike to trespass on your time and kindness, if you would be so good as to give me a list of the stuff you bid in, in which you think I might be interested, I would be very glad to pay off on it. As I understand it however the title would have to be with you or somebody else other than myself for a deed to be issued. You understand I am sure that I am not sufficiently interested to redeem."

This letter leaves the Court confused. We are unable to determine with reasonable certainty how Stivers and Brewster were operating in the Mingo land market, particularly the 400 acre tract in question. Three things stand out in the November 20, 1937 letter of Stivers: Stivers and Brewster were doubtful of title to the condemned land in 1937. Brewster carried land in Stivers' name but Stivers did not know what land. Brewster purchased land at tax sale for Stivers and Stivers called on Brewster to tell him what land he had purchased and if he approved of the purchase he "would be very glad to pay off on it." The other letters add nothing to the substance of Brewster's claim. Does this evidence meet the standards to establish an express trust?

 Intervenor Brewster recognizes the force of the statute requiring an ex-

press trust in land to be established in writing. Sec. 3494, R.S.Mo.1939, Mo.R.S.A. ; Thomson v. Thomson, Mo.Sup., 211 S.W. 52. No special words are necessary to create an express trust. Darling v. Buddy, 318 Mo. 784, 1 S.W.2d 163, 58 A.L.R. 493. But it is well established that in order for an instrument or series of instruments to create an express trust it is necessary that the language do so in reasonably clear, explicit, definite and unequivocal terms. Samuel Haas Trimmed Hat Co. v. Service Ass'n, 222 Mo.App. 307, 297 S.W. 129. In Ferguson v. Robinson, 258 Mo. 113, 167 S. W. 447, loc. cit. 453, the Court states that the writing must be of such a nature that the Court can "determine from this writing the existence, terms, and limits of the trust." The Court is not permitted to speculate, guess or surmise as to meaning of the instruments and relationship of the parties. We are unable to hold on this record that Brewster carried the burden of establishing an express trust. Brewster does not claim a resulting express trust. We think the facts insufficient to establish it.

■ There is another obstacle to Brewster's claim. He infers that he and Stivers bought the land prior to 1923. Never at any time did he pay any taxes on it. Two quiet title suits were brought, the last in 1931. Stivers and Brewster knowingly observed proceedings to sell the land for taxes. When Luer purchased the land taxes were due on it from 1931 to 1938. No effort was made to redeem. Luer paid taxes thereafter until 1941 when he received the collector's deed. Still no action was taken by Brewster. Stivers died in 1941. Still no action was taken by Brewster. The condemnation proceeding was filed in December, 1941. The commissioners' report on compensation was filed in February, 1943. On exceptions to the commissioners' report a jury trial was had in January, 1945. Motion for new trial was overruled in October, 1945. The Court fixed time to file intervening petitions on or before April 1, 1946. Not until October, 1946; did Brewster file his intervening petition. Prior to filing of the condemnation proceedings Brewster knew if taxes were not paid the land would be sold again for taxes. Brewster stood by and permitted

Luer to finance the land to the extent of paying taxes. Brewster stood by while Luer provided the landowner's presentation on trial of the case on the Government's exceptions to the commissioners' report. Only after it had been definitely established that there was over $5,000 on deposit instead of the land, and that all exceptions to the deposit were disposed of, did Brewster appear upon the scene with his claim. It is no answer to this conduct for Brewster to say that he has agreed that attorneys may be compensated out of the fund. The fact remains that he expended no money or effort until the money was in the court depository, with all questions settled but landowners' interests. He let Luer create the fund and in effect took no chances until the money was in sight. He let Luer take the chances, provide the funds to keep the land from being sold for taxes and defend the case in court with his money, time and effort. Such conduct is laches of a character to defeat Brewster's claim, even if he could prove existence of a trust.

Settle order in accordance herewith.