ANDREW LORIMER, APPELLANT, v. MILTON McGREEVY ET AL., RESPONDENTS.—84 S. W. (2d) 667.

Kansas City Court of Appeals.   June 3, 1935.

*Scarritt, Jones & North* for appellant.

*Lathrop, Crane, Reynolds, Sawyer & Mersereau* for respondents.

*Langworthy, Spencer & Terrell, Amici Curiae.*

*Davis, Polk, Wardwell, Gardiner & Reed* and *Ropes, Gray, Boyden & Perkins* of counsel.

TRIMBLE, J.—Plaintiff sued in replevin to recover possession of two so-called "Gold Debentures" of the par value of $1000 each,

numbered respectively M-6064 and M-10140, both dated April 1, 1929, and due April 1, 1944, being a part of a thirty-million dollar issue put forth by the "International Hydro-Electric System of Massachusetts;" each of the securities involved in this suit has attached thereto twenty-nine semi-annual six per cent interest coupons, numbered consecutively from 2 to 30 both inclusive, maturing on the first days of April and October of each year from April 1, 1931, to April 1, 1944, both inclusive, coupon No. 1 of each security having been theretofore detached and not involved in the replevin. Under a properly executed replevin bond, the sheriff delivered the replevined property to plaintiff.

Defendant's amended answer on which the case was tried contained first, a general denial and next, a special defense alleging that defendants, Milton C. McGreevy and Milton W. McGreevy, doing business as McGreevy & Company, are brokers and members of the New York Stock Exchange and said debentures were delivered to them by the National Bank of North Kansas City, doing business in Clay County, Missouri, for sale on said New York Stock Exchange; that said defendants, as brokers, sold said securities on said exchange and promptly paid the proceeds to said bank; that thereafter defendants were notified that said securities had been stolen; and claim for same was made by the party claiming to be the owner thereof, whereupon, about April 5, 1930, defendants reimbursed the purchasers thereof to whom defendants had sold them, paying the then market price of $2145.66, and thereupon they were returned to these defendants in Jackson County, Missouri, and continued in their possession until taken under the writ of replevin issued in this case; that at the time hereinabove referred to, defendants had no notice that any other than said National Bank of North Kansas City was the owner of said securities and had no notice of any infirmity, if any, in its title to said property, nor did these defendants' representative, Josephthal & Company or Moors & Cabot, at the time they handled the same on the stock exchange, have any knowledge of any infirmity therein; that said defendants, upon reimbursing the purchasers to whom they had sold said property, acquired all the rights of holders in due course, and now are such, with the right to hold same, and demand the return thereof. The answer further set up that defendants had been damaged in the sum of $1500, for which they asked recovery, in addition to the recovery of said securities.

A jury was waived, and the cause submitted to the trial court upon an agreed statement of facts together with a deposition of the plaintiff. The trial being had, the court took the case under advisement, and later found against plaintiff, and for defendants. The court found that "the bonds involved herein are negotiable; that

the defendants are the lawful owners of said bonds (describing them) ; that defendants are lawfully entitled to the possession of said bonds; that said bonds are wrongfully repossessed and detained by the plaintiff." The court assessed the value of the property at $860 and damages for the wrongful taking and detention thereof at $1255.56, and rendered judgment for the return of said property and damages, or for the value of said property and damages, all in the usual form. Plaintiff in due form appealed.

At the time the judgment was rendered and the appeal taken, the defendant Milton C. McGreevy was alive, but as he has since died, the executor and executrix of his last will and testament, Milton C. McGreevy and Dora McGreevy, have, by agreement, been made parties defendant and substituted in his place, and the case is now styled as above.

As stated, the securities involved herein are each denominated therein a "Gold Debenture." Just why they should be given the supposedly lofty and imposing title of "debenture" is not easily comprehended. In ordinary parlance they are, and should be, called "bonds." An English writer, Buckley, speaking for the time he wrote, said: "No one seems to know exactly what 'debenture' means." And Judge CHITTY, in 56 Law Journal Chancery, 817, said: "So far as I am aware the term 'debenture' has never received any precise definition. It is, comparatively speaking, a new term." It seems to have originated in English governmental departments when an instrument was issued in which the government was charged with the payment of (possibly promised to pay) a specified sum to a creditor, the amount found to be due upon an auditing of his account. In the United States it was originally a certificate given by the collector of a port, under the United States Custom Laws, to an importer specifying the allowance to be made him upon the duties due on imported merchandise, which the importer, instead of selling in this country, re-exports. In other words, it was a certificate showing the amount to be deducted from the duty to be paid, or, if it had been already paid, the amount of refund to which the importer was entitled. The word is derived from the Latin "debentur" which means, "they are due." In the sense in which the term "debenture" is used concerning the securities involved in this lawsuit, it, perhaps, may be properly described as a security, or promise to pay, for a loan of money issued by a public company, usually creating a charge on the whole or a part of the company's stock and property, though not necessarily in the form of a mortgage. Such debentures usually have coupons attached to facilitate the payment of interest; and they are generally issued in a series. [See Barton Natl. Bank v. Atkins, 72 Vt. 33.] In the work entitled "Green's Brice's Ultra Vires" (2 Am. Ed.), p. 230, it is said that

"Debentures may be defined as instruments under seal, creating a charge according to their wording upon the assets specified therein of the corporation, and, to that extent, conferring upon the grantees a priority over other subsequent creditors or existing creditors not possessed of such a charge. Under this term, however, are often included two other varieties of instruments which do not answer this definition strictly. There are consequently *three varieties of debentures*: I. Instruments which do not confer a charge, *and which are nothing more nor less than ordinary bonds and ought to be so styled.* II. Debentures in the true and proper sense. III. Instruments which contain more than a mere charge, which are *mortgages in fact,* and which, from possession in addition thereto, the characteristics of debentures, may be for convenience, and often are, called *mortgage* debentures." (All italics mine.)

At page 265 et seq., the same work deals with the negotiability of such instruments dividing them into three classes, the third of which is discussed on page 267 as follows:

"Or, thirdly, the document is fully negotiable. This seems to be not only the only logical conclusion at which, in a majority of cases, a reasoner can arrive, but also, since Goodwin v. Roberts, 10 Law Reports of the Exchequer, 337, the only conclusion allowed by the authorities. The fact that the seal was affixed is of slight importance. It denotes that the corporation has duly executed the instrument, nothing more, not converting it into a deed nor rendering necessary that a transfer should be under seal. It is, in a word, a negotiable instrument, pure and simple, belonging to the class of simple contracts, and attested by the corporate seal as a formality solely."

In a note at the foot of page 268 of said work, it is said that the discussion contained in the text on the preceding section, is without practical importance in this country in view of the well-established rule that obligations providing for the payment of money, made by states, municipal and private corporations, and intended to pass by delivery, although under seal, have the properties of negotiable instruments, and when transferred before maturity to *bona fide* purchasers have the usual characteristics of commercial paper. The reason for the rule does not seem to be based upon their being made payable to bearer or being issued in blank, except so far as such language or such mode of uttering them may be taken as evidence of the intention of the maker to impress upon them the qualities of negotiable commercial instruments. The decisions of the courts are based as well upon the intention of the parties, as upon the necessities of trade. In the case of Mercer County v. Hacket, 1 Wall. 83, 1. c. 95 (1863), Mr. Justice GRIER, of the United States Supreme Court, uses language fully supporting the above statement. He says:

"This species of bonds is a modern invention, intended to pass by manual delivery, and to have the qualities of negotiable paper; and their value depends mainly upon this character. Being issued by states and corporations, they are necessarily under seal. But there is nothing immoral or contrary to good policy in making them negotiable, if the necessities of commerce require that they should be so. A mere technical dogma of the courts or the common law cannot prohibit the commercial world from inventing or using any species of security not known in the last century. Usages of trade and commerce are acknowledged by the courts as part of the common law, although they may have been unknown to Bracton or Blackstone. And this malleability to suit the necessities and usages of the mercantile and commercial world is one of the most valuable characteristics of the common law. When a corporation covenants to pay to bearer and gives a bond with negotiable qualities, and by this means obtains funds for the accomplishment of the useful enterprises of the day it cannot be allowed to evade the payment by parading some obsolete judicial decision that a bond, for some technical reason, cannot be made payable to bearer. That these securities are treated as negotiable by the commercial usages of the whole civilized world, and have received the sanctions of judicial recognition, not only in this court (White v. Vermont Railroad Co., 21 How. 575), but of nearly every state in the Union, is well known and admitted."

The question whether the instruments are or are not negotiable is a, or perhaps is *the*, vital point in this case. For, if they are stolen, and are negotiable, defendants having acquired them in good faith and in the usual course of business, are entitled to hold them even as against the one from whom they were stolen. If they are *not* negotiable, defendants have no title to them. [9 C. J. 63; Scollans v. Rollins & Sons, 173 Mass. 275.] In fact, this is conceded by the parties. So that, if the instruments sought to be replevined herein are negotiable, the decision must be affirmed. If they are not, the case must be reversed and the cause remanded with directions to render judgment for appellant, since, in that case, he still has title to, and consequently the right to the possession of, these securities.

Unquestionably, they belong to the first classification made by Green's Brice's on Ultra Vires, quoted supra, in that they "are nothing more nor less than ordinary bonds, and ought to be so styled." But, of course, it is not meant to assert that they are negotiable regardless of whether they contain statements which, under the Negotiable Instruments Act, render them not negotiable. That act is a comparatively late statutory enactment which fixes their character and status regardless of their *form*, the way they are intended to be used, the purpose for which they were created or the construction heretofore placed upon such instruments by decisions

dealing, at the time, with custom or usages under what is known as the law merchant.

So far as concerns the *form* of these bonds or "debentures," it might seem to be that of a negotiable security. They read as follows:

"*United States of America*

"$1000  Commonwealth of Massachusetts  $1000

"*International Hydro-Electric System*

"Convertible 6%  Gold Debenture

"Number  Number

"M  6064  M  6064

"Due April 1, 1944.

"International Hydro-Electric System (hereinafter called 'The Company') for value received hereby promises to pay to the bearer, or if registered to the registered owner of this debenture, on the first day of April, 1944, One Thousand Dollars in gold coin of the United States of America, of or equal to the standard of weight and fineness existing April 1, 1929, at the office or agency of the Company in the City of Boston, Commonwealth of Massachusetts, and to pay interest thereon at said office or agency in like gold coin from April 1, 1929, until fully paid, at the rate of six per cent (6%) per annum, semi-annually on the first days of April and October in each year, but in respect of installments of interest becoming due at or prior to maturity only upon presentation and surrender of the annexed interest coupons, as they severally mature."

Then follow certain provisions as to payment of principal and premium, if any, and other provisions all "at the holder's option" and the payment by the company of any Federal income tax, not in excess of two and one-eighth per cent of such interest and certain other provisions, but none of which (in the judgment of the writer hereof) affects or destroys the negotiability of the instruments in question.

Such provisions as may be argued by appellant to affect such negotiability will hereinafter be quoted and set forth in full.

Each of said so-called "debentures" contain this statement:

"This debenture is one of an authorized issue of Convertible 6% Gold Debentures of the Company limited to the aggregate principal amount of thirty million dollars ($30,000,000) at any one time outstanding, issued under and pursuant to a Trust Indenture, dated as of April 1, 1929, between the Company and the Chase National Bank of the City of New York, a corporation organized and existing under the laws of the United States of America, as Trustee, to which Trust Indenture reference is hereby made for a statement of the rights and remedies of the Trustee, and the respective holders of the debentures thereunder. . . .

"The Company is a voluntary association duly created and existing under the laws of the Commonwealth of Massachusetts, under and by virtue of a Declaration of Trust, dated the 25th day of March, 1929, a copy of which has been filed in the office of the Commissioner of Massachusetts, and this debenture and the annexed interest coupons are issued in accordance with the laws of said Commonwealth, and the covenants and agreements of the Company herein and in the annexed coupons contained shall be and always be construed in accordance with and governed by such laws, regardless of the place of payment of the principal of or interest on this debenture or otherwise. The name 'International Hydro-Electric System' and the term 'Company' as used herein refer to the Trustees for the time being under such declaration of Trust as Trustees thereunder but not personally; and, anything herein and in said Trust Indenture to the contrary notwithstanding, this debenture and the attached interest coupons are issued upon the express condition, to which each successive holder thereof assents, and by receiving the same agrees, that no past, present or future trustee, shareholder, director, officer or agent of the Company shall be held to any personal liability for the payment of the principal of or premium or interest on this debenture or any part thereof or for any claim based thereon or otherwise in respect thereof or of the indebtedness represented hereby, or by said Trust Indenture, whether by virtue of any statute or the enforcement of any assessment or otherwise, all such liability being by the acceptance hereof and as part of the consideration for the issue hereof expressly waived and released. . . .

"In Witness Whereof, International Hydro-Electric System has caused this debenture to be signed in its name and behalf by its President or a Vice-president, and its seal to be hereto affixed and attested by its Secretary or any Assistant Secretary, and coupons for said interest bearing the facsimile signature of its Treasurer to be attached hereto, under date as of the first day of April, 1929.

"INTERNATIONAL HYDRO-ELECTRIC SYSTEM,
"By W. HOWMAN, Vice President.
"Attest: Crudam, Assistant Secretary.
"(Common Seal International
Hydro-Electric System, 1929.)"

The agreed statement of facts, upon which the case was submitted, states, among other things, that:

Plaintiff was, on and prior to December 1, 1929, the owner, for value, of the two debentures with attached coupons, involved in this suit "which *bonds* may be considered in evidence without further proof." (Italics mine.)

The two debentures involved herein were executed on and in behalf of said association under its seal, and are identical in form

as to number, and are secured by the trust indenture hereinbefore mentioned, a copy of which, marked C, is attached.

■ True copy of the form and language of debenture M 6064 is attached and evidences the form and language of both instruments and that they "together with all other debentures of said 'The Hydro-Electric System' issued under the aforesaid trust indenture in the aggregate principal amount of $30,000,000 were at all times herein mentioned and now are listed and sold on the New York and Boston Stock Exchanges."

■ As to the twenty-nine semi-annual interest coupons attached to each debenture, numbered and maturing and the first one having been detached and not involved herein, all as heretofore stated.

■ Relating to copy of coupon No. 2 and evidencing form and language of all other coupons.

■ "After plaintiff acquired ownership of said debentures, with coupons attached, in December, 1929, he never sold, assigned, transferred, nor voluntarily parted with the title to or possession thereof."

■ "Prior to December 10, 1929, said two debentures each having twenty-nine interest coupons attached thereto were stolen from the office of plaintiff, in Detroit, Michigan, by some unknown person."

■ On or about the 12th day of December, 1929, defendants McGreevy and Company (brokers and members of the New York Stock Exchange), in their usual and ordinary business, received said debentures from National Bank of North Kansas City, Missouri, a national banking association organized under the laws of the United States and transacting business in North Kansas City, Missouri, to be sold for said bank. . . .

■ Thereafter and on December 12, 1929, defendants, in the usual course of business, acting through their correspondent brokers, Josephtal & Company, in New York City, "also members of the New York Stock Exchange, without disclosing the name of their customer in accordance with the custom of brokers in such transactions, *sold* said debentures on the New York Stock Exchange to Moors and Cabot of Boston, Massachusetts, also members of said New York Stock Exchange, who did not disclose the name of their customer, in accordance with the custom of brokers in such transactions, and who immediately paid the purchase price thereof, and that said debentures were thereupon delivered to said Moors and Cabot, and were by them delivered to their customer for whom they were acting."

■ "Each of said bonds were sold for $991.25 plus accrued interest of $12, and the proceeds of said sale were paid to defendants on December 13, 1925, and the same day defendants paid the same amount, less their brokerage fee, to said National Bank of North Kansas City."

■ Defendants dealt with said National Bank of North Kansas City as the owner of said debentures, and at the time that defendants and said Josephtal & Company received and sold said debentures and at the time that defendants paid the amount of the proceeds thereof to said National Bank of North Kansas City neither defendants nor said Josephtal & Company had any knowledge or notice of any infirmity or defect of title to the same, and neither said Moors & Cabot nor their customer, for whom they purchased said debentures, had any knowledge or notice of any infirmity or defect in the title thereto.

■ Under the rules of the New York Stock Exchange, which rules constitute a contract between the members of said stock exchange, instruments claimed to have been lost or stolen are not ''good delivery,'' and if such instruments are delivered by or through a member of said stock exchange, and a claim is made that such instrument was lost or stolen, the member selling or causing delivery to be made thereof is obligated to take the same back when tendered and to deliver instruments of the same kind or character constituting ''good delivery.''

■ ''On January 14, 1930, defendants were notified that claim had been made by the purchaser of said debentures for whom said Moors and Cabot were acting that said debentures had been stolen prior to the aforesaid purchase by him, and said debentures were tendered to defendants with demand that defendants take them back and deliver bonds of the same kind and character constituting good delivery in accordance with the rules of said New York Exchange, defendants thereafter purchased other debentures of the same kind and character on the New York Stock Exchange paying therefor the sum of $1067.50 for, and $2.83 interest on, each of the same, and delivered the same to the aforesaid purchaser through said Moors and Cabot and received said debentures claimed to have been stolen; that defendants have never been repaid the amount paid by defendants, or any part thereof, to purchase said debentures to replace the bonds involved in this case.''

■ ''The International Hydro-Electric System is a voluntary association, created and existing under the laws of Massachusetts, having a president and other officers, and a seal, and issuing certificates of stock which represent, and whereby are transferred, the rights of the respective shareholders thereof. A copy of the declaration of trust creating such association is attached hereto, marked 'Exhibit D,' and may be considered in evidence without further proof.''

■ ''Defendants had possession of the debentures in question at the time this suit was instituted and that plaintiff took possession of said debentures from defendants by virtue of the replevin writ

issued on this cause on December 18, 1930, after having made demand of said defendants for said bonds, which demand was refused.''

■ ''The market value of each of said bonds, with coupons attached, at the time of the institution of this suit was $825 plus interest on the principal amounts of said bonds at the rate of six per cent per annum from October 1, 1929.''

■ ''It is further agreed that the property described in the replevin petition herein has not been seized under any process, execution or attachment against the property of plaintiff; and that plaintiff's right of action, if any, against defendants accrued within one year from the date of filing of the petition in replevin herein.''

■ (In this paragraph the parties agreed that the question as to the value of the property and of damages, if any, are reserved until the decision is made as to whether plaintiff or defendants be entitled to the possession of the property in question. When this is announced the parties will either file a stipulation as to the value of the property and damages or will produce evidence on such matters.)

■ If Milton C. McGreevy and John A. Prescott were called as witnesses for defendants they ''would each testify that he is engaged in the stocks and bonds brokerage business; that he is a member of the New York Stock Exchange; that the debentures here in question were, during the times here in question, listed on the New York Stock Exchange; that there are a large number of debentures, similar to those here in question, which have been issued by nonincorporated or voluntary associations and placed on the market, and that the same, as well as the debentures herein in question, are customarily treated by brokers and the buying public, that is, are bought, sold and dealt with, on the market as ''negotiable'' instruments. (Plaintiff reserves the objection that such testimony is irrelevant, does not tend to prove any issue, and has no legal bearing on the question of whether these debentures are negotiable instruments.)

The plaintiff's deposition was introduced wherein he testified to his ownership and possession of the bonds, of his having placed them in a book in the top drawer of his desk in his office in Detroit; of their being stolen, of the value of the bonds; and a further showing that on October 28, 1933, their value was a total of $2115.56.

Plaintiff's motion for new trial asserted that the finding and judgment of the court were erroneous and contrary to law, and, under the evidence and agreed statement of facts, should have been in favor of plaintiff and against defendants. ''(3) That the court erred in finding that the debentures herein replevined and involved herein were negotiable instruments and in finding that the same were the property of defendants or that the defendants had good or any title thereto;''

"(4) Under the law and the agreed statements of facts, the court should have found that plaintiff was the owner of and/or entitled to the possession of the debentures involved herein and hereby replevined."

"(5) The demages found and assessed by the court are excessive and not supported by the evidence or any evidence."

As heretofore intimated, appellant in his statement says: "The matter here at issue, therefore, narrows down to the single and simple question as to whether or not these bonds are 'negotiable instruments,' within the meaning and requirements of the Negotiable Instruments Law of Massachusetts. If they are, the decision herein should be for defendants. If they are *not*, the decision must be for plaintiff, in that he has title to and, therefore, the right to the possession of these bonds. (Emphasis the appellant's.)

It will be observed that plaintiff apparently insists that the question as to negotiability is to be determined under the Massachusetts Law and by the *Massachusetts* Negotiable Instruments Law. As the Uniform Negotiable Instruments Act has been adopted by Massachusetts as well as by New York and other states, including Missouri, it would seem that the law governing the question herein should be the same in all states adopting that act. But, since the "debentures" or bonds (call them what you will), were issued in accordance with the laws of the commonwealth of Massachusetts and with a provision therein that the "covenants and agreements of the company herein and in the annexed coupons contained shall be and always be construed in accordance with and governed by such laws, regardless of the place of payment of the principal of or interest on this debenture or otherwise," it is urged that the law as contained in the decisions of that state, construing the Uniform Negotiable Instruments Act, should be conclusive on the question of whether the instruments involved herein are negotiable. It will be observed, however, that the provision does not relate to the question of the "negotiability" of the bonds but solely to the *liability* of the company. The question of the negotiability of the bonds is one which in this case governs the rights of third parties *as between themselves*, and hence such rights should not be controlled by the above quoted provision but is, if to be governed by any construction of a particular state and not by the general rules as to negotiability, should be decided by the laws of the state where they were acquired by the holder as well as from an examination of the provisions of the bonds themselves. As to where this was, the writer of this opinion thinks that paragraphs 9 and 13 of the agreed statement of facts show that defendants acquired them in the State of Massachusetts. The agreed statement of facts does not specifically state that defendants received them on the New York Stock Exchange,

though all the transactions arising from the buying and selling of these bonds took place on the New York Stock Exchange. When a broker sells a security on said exchange to another broker, wherever he may be, the transaction is completed on said exchange, and such · purchases by brokerage firms are so treated. Defendants, when told that the bonds were stolen bonds, purchased others and replaced the stolen bonds. This, under Gruntal v. U. S. F. & G. Co., 254 N. Y. 468, gave good title to the bonds, if good title can be obtained. The foregoing discussion does not even impliedly concede that the decisions of Massachusetts hold, or would hold, that in the circumstances of this case the bonds herein are non-negotiable. It is no doubt true that the Massachusetts courts, in a number of cases, have held voluntary associations, *somewhat like* the International Hydro-Electric System, to be partnerships, and that the shareholders or members become obligated and are held liable as partners. When this is the case, doubtless the securities issued by such organizations are not negotiable. [Williams v. City of Boston, 208 Mass.. 497 ; Horgan v. Morgan, 233 Mass. 381; Ashley v. Downing, 203 Mass. 311.] The Williams case was one involving the question of taxation, and at page 501 of said 208 Mass., the court say:

''In the leading and substantive features that distinguish ordinary partnerships, this association is within the spirit and meaning of the law of partnership. The limitations upon the power and liability of individual members and the attempt ·to avail themselves of many of the privileges of stockholders in corporations relate more to details and to the machinery of management than to the substantive purposes of the enterprise.

''There are reasons of policy why the members should be held to be partners within the meaning of this section, for as such trusts are not regulated by statute, and no returns are required of them, interests in them held by nonresidents of the city or town where their business is conducted would be liable to escape taxation unless the property is taxed in the firm name.''

In the second case last above cited, Horgan v. Morgan, 233 Mass. 381, 383, the court held that the association in that case was a partnership and not a trust, on the authority of Frost v. Thompson, 319 Mass. 360. In this last cited case, at page 365, it is pointed out that—

''A declaration of trust or other instrument providing for the holding of property by trustees for the benefit of the owners of assignable certificates representing the beneficial interest in the property may create. a trust or it may create a partnership. Whether it is the one or the other depends upon the way in which the trustees are to conduct the affairs committed to their charge.'' [See also on this point, Williams v. Inhabitants of Milton, 215 Mass. 1.]

The case of Ashley v. Dowling, 203 Mass. 311, is not deemed to be in point on the question involved in the case at bar. The case of Adams v. Swig, 234 Mass. 584, apparently holds that the defendant therein was a distinct entity in and of itself and liable on the note sued on, and not the trustees. It would seem to follow that said defendant was a business trust and not a partnership, and that it could be held liable as a principal on a note as a distinct entity separate and apart from the trustees or its shareholders. It follows that it cannot be said that the courts of Massachusetts do not hold that such a body as the International Hydro-Electric System is necessarily a partnership and cannot be held liable as the real promissor on its securities and therefore the bonds issued by it are not, under Massachusetts decisions, to be regarded as negotiable regardless of the character of the trust creating it. The Statutes of Massachusetts expressly define such voluntary associations and provide that they be sued "and its property shall be subject to attachment and execution in like manner as if it were a corporation."

It will be observed that each of the so-called "debentures" contain the express statement that the company issuing it "is a voluntary association duly created and existing under the laws of the Commonwealth of Massachusetts" and the debentures and annexed coupons are issued in accordance with the laws thereof and shall be construed in accordance with such laws, and that, too, regardless of the place of payment of the principal or interest thereof. Also that the name "International Hydro-Electric System" and the term "the company" refer to the trustees, for the time being, under the Declaration of Trust, as trustees but not personally, and regardless of what the trust indenture may contain or say, the debentures and attached coupons are issued upon the *express condition* to which every successive holder assents, that no trustee, past, present or future, shall be held to any personal liability.

Before passing on the vital question of negotiability or nonnegotiability, it may be well to dispose of certain other questions which appear to otherwise raise a doubt as to plaintiff's right to maintain replevin herein. The first is, that it is nowhere shown that plaintiff is, or ever was, the owner or entitled to the possession of the securities in controversy, which, of course, is necessary to carry on a suit of this nature. We think, however, that paragraphs 6 and 7 of the agreed statement of facts, hereinabove set out, are sufficient of themselves to establish the right to maintain the suit *if* the law is such as to establish his contention of the *non*negotiability of the securities herein concerned.

The second contention is that the record omits to set forth the Declaration of Trust introduced in evidence as Exhibit D, and therefore, the finding of the trial court must be approved, inasmuch as

it is clear that he had evidence before him which the appellate court cannot examine. But the trouble with this contention is that, as a matter of law, the omitted evidence is as to the contents of another and different instrument from that of either of the so-called debentures, and that even if such other instrument were in the record it could have no force or effect to make the instruments involved herein negotiable. If to determine the question of their negotiability requires the aid or examination of another instrument, then that question is already settled, *ipso facto*, in the negative. An instrument must carry the marks or necessary elements of negotiability upon its own face, and not elsewhere. So that the question of whether the two securities involved herein are negotiable instruments can be, and indeed must be, determined from the record before us; and this, it would seem, is, in reality, *conceded* when it is admitted that the "issue between the parties, accordingly, is limited to the sole question of whether the bonds are negotiable instruments."

Returning now to the question whether the instruments are to be regarded as, and held to be, negotiable or nonnegotiable, it seems to us that the law and decisions of Massachusetts should be regarded as controlling, and certainly if the nature of the debentures is affected by the statements in the instruments, then it would seem that they are creations of Massachusetts law, which to our minds, holds that the instruments are *not* negotiable. Indeed, it seems that respondents are now willing to concede that, in determining the negotiability of the debentures in question, the law of Massachusetts governs. The opinion written on the original submission to, and hearing before, this court so held, and respondents in their "supplemental brief on rehearing" on page 2 thereof, state that, on said original hearing, it was immaterial whether the law of Massachusetts or New York controlled, in determining the negotiability of the debentures in question, as the Negotiable Instruments Act had been adopted by both states; but that if the question of which law governed was material then the law of New York governed. "This for the reason that it was in that State that respondents obtained title to the debentures in question." After calling attention to the fact that the original opinion held that the law of Massachusetts governed, respondents, in said supplemental brief on rehearing, say: "In order that a discussion of this question" (which of the two laws should govern, this parenthesis being inserted by us) "(which we deem to be immaterial) may be eliminated, we will in the following argument, adopt this view of the court as controlling."

However, lest it may be claimed that this was a concession merely for the sake of the argument, we submit that respondents are in error in saying that respondents obtained title in New York, because, as shown by paragraph 9, page 13 and paragraph 13, page 14, of ap-

pellant's abstract, the first of which recites that respondents, Mc-Greevy & Company (whose place of business is in Kansas City), through their New York Brokers (Josephtal & Co.) sold said debentures to Moors and Cabot (who resided in Boston, Massachusetts) and the last of which (paragraph 13, page 14 of said abstract), recites that when defendants (respondents) were notified that said debentures had been stolen, respondents "through said Moors and Cabot," purchased other securities for said purchaser and received back "said debentures claimed to have been stolen" so that, in thus receiving the debentures back in Boston, after having made good the loss sustained, respondents were, for the first time, entitled to claim that they had paid value for, and were entitled to hold, said debentures.

In other words, whatever *transfer* of the debentures to respondents, for which they paid value and could, by any reason, be entitled to claim them, *took place in Boston*, i. e., in Massachusetts; so that the view that the law of Massachusetts governs the question of the negotiability of the debentures is correct even on the theory that the transfer thereof occurred in that State and not in the State of New York. Furthermore, the case of Hibbs v. Brown, 190 N. Y. 167, 82 N. E. 1108, when properly considered, is not based on facts sufficiently similar to the facts in the case at bar, to be controlling on the vital question herein. Again, the contention that Massachusetts, by an amendment of its statute in 1916, making a voluntary trust or association a distinct or "separate entity" is not true to the extent necessary to uphold the claim made that, as the International Hydro-Electric System of Massachusetts is a distinct and separate entity, its securities issued can be held to be negotiable. The trouble with this contention is that the Massachusetts Statutes of 1916 and 1926 do not make such voluntary associations or trusts distinct and separate entities for *all purposes* but only *for the purpose of being sued*. [Larson v. Sylvester, 185 N. E. 44, 46 (decided in 1933).] In that case the trustee for a building trust was sued. It was shown that he made the contract relied on but did not, in the contract, provide that he should not be held personally. (In the case at bar the situation is precisely to the contrary.) The court, on the page cited, 46 say: "Save for the purpose of being sued, the trust, as distinguished from the trustee, *is not made a separate entity*." (Italics ours.) And, theretofore, on the same page, the court say: "Contracts with regard to the rights and property affected by trusts are the contracts of the trustee. He, in person, is liable upon them. He is not acting as representative of another." In the case at bar, the "company," or voluntary association, issuing the debentures in question, had it expressly stated therein that they are "issued upon the express condition, to which each successive

holder thereof assents, and by receiving same agrees, that no past, present or future trustee, shareholder, director, officer or agent of the company shall be held to any personal liability for the payment of the principal of or premium or interest on this debenture or any part thereof or for any claim based thereon,'' etc. It is difficult to see, under these circumstances, how it can be said that the debentures contain an unconditional promise to pay.

It is indubitable that, without regard to whether the "International Hydro-Electric System of Massachusetts" can, under certain circumstances, be judicially construed to be a partnership, a voluntary unincorporated association, or as an entity like, and having many of the powers of, a corporation, there are some facts standing forth so clearly from the instruments themselves, that we are unable to ignore or shut our eyes to them.

1. That the International Hydro-Electric System is not an entity created by law, but is a mere *name* given by a trust agreement, under and by which the debentures are directed to be issued, by the trustees in said agreement.

2. That the trustees are in reality those who authorize the issuance of these debentures.

3. That in the very authorization of such issue, *it is expressly provided* that none of such trustees shall in no way, and in no event, be held liable for the payment of the interest or principal of said debentures.

The inevitable effect of this is to leave *nothing liable* for the payment of such obligations except such as may be found left at any time in the particular fund or amount appearing in the coffers of this *name* created by the trustees of the trust fund agreement, under which name the promise to pay must be issued. If this organization so created and named, is an *entity* empowered to issue obligations with the same full and complete power as that conferred upon corporations, i. e., negotiable instruments, why was it necessary to guard against the liability of the trustees who, in reality, are the creators of the obligations, by expressly providing in the body of the instruments that such trustees should not be liable?

The International Hydro-Electric System being a *mere name* adopted by those forming the trust agreement, and those trustees having expressly provided that they should not be personally liable, two provisions of our Negotiable Instruments Act (the same in all the states that could be said to be involved) are left in such state as to prevent the obligations issued from being negotiable.

1. They are carrying upon their face the absolute evidence that they are not an unconditional promise to pay.

2. They do not engage that the full credit, assets and property of the entity, or body (call it what you will), *named* as the issuer

of the obligations are bound for the payment of the debts expressed therein. Only the fund in the coffers of this name under which they are issued can be looked to for payment. To be negotiable, an instrument *must* conform to certain requirements of the Negotiable Instruments Act, one of which is that it must contain an unconditional promise or order to pay. [Sec. 2630, R. S. Mo. 1929 (1 Mo. Stat. Ann., p. 644).] Another is that "an order or promise to pay out of a particular fund is *not* unconditional." [Sec. 2632, R. S. Mo. 1929 (1 Mo. Stat. Ann. 646). See, also, the same act in the other two states.] This does not mean that the particular fund out of which it has to be paid, must be designated by name; but if there are sufficient statements in the promising instrument which necessarily result in making it payable out of a certain fund (as there are in these "debentures"), they cannot be said to be unconditional. In states that have adopted the Negotiable Instruments Act, the matters determining the issue of negotiability or nonnegotiability of a security are the provisions of the act itself, 8 C. J. 114. "The true test in every case under the Negotiable Instruments Law, as well as at common law, is whether the *general credit* of the maker or drawer accompanies the instrument. If it does, the instrument is negotiable, otherwise it is not." (Italics mine.) [3 R. C. L., sec. 71, p. 885.] But who is the "maker" of those debentures? The "International Hydro-Electric System" appears as the signer thereof, but it also appears on the face of the instruments that such is the name adopted by the trustees in the Declaration of Trust under which the promises to pay are issued. The promise to pay is, therefore, not the obligation of this "trade name," but the promise of the trustees mentioned in the Declaration of Trust. Taylor v. Davis, 110 U. S. 330, 1. c. 335, where the court say, "If a trustee (or, as in this case, a number of trustees) wants (or want) to protect himself (or themselves) from individual liability on the contract, he (it or they) must stipulate that he (it or they) is (or are) not to be personally liable," and that is exactly what was done in this case. See also Hussey v. Arnold & Ohio, Trustee, 185 U. S. 202; Darling v. Buddy, 318 Mo. 784, where it is said quoting from Belts v. Blacathorn, 252 S. W. 604, "A general rule in the law of trusts is that a trustee is a principal and not an agent for the *cestui que trust*," from which it follows that the guaranty of the creditor is the personal liability of the trustee, or trustees, in the case at bar. But, as we have seen, they have expressly inserted a condition that they are not to be held liable.

In the conclusion we have finally reached as to the true character of these debentures, namely, that they are not, under the terms of the Negotiable Instruments Act, negotiable, we have been greatly influenced by many things said in Edward H. Warren's work en-

988

titled "Corporate Advantages without Incorporation," pages 477-500. We cannot close our eyes to the effect of the statutory change in many phases of the law by the Negotiable Instruments Act. It must be followed, notwithstanding many learned decisions, written before that act, and worthy of the most serious consideration, but which were handed down when the niceties of commercial instruments were the outgrowth of the rules established by the law merchant. In the presence of the statutory enactment referred to, we cannot give effect to any former *custom* of dealing or treating with certain commercial instruments, for, in the present situation mere *custom,* no matter how venerable nor highly placed, can no longer make them negotiable. [Manhattan Co. v. Morgan, 242 N. W. 38, 150 N. E. 594.] Neither can the fact that the instruments involved in the case at bar are made payable to bearer, be regarded as necessarily, or in any way, making them negotiable. [Railroad Company v. Howard, 74 U. S. 392, 415.]

We entertain the view that, under the agreed statements of facts, the evidence in the instruments themselves and the statutory enactment in force in the three states, we must hold that the debentures involved herein are not negotiable. Hence the plaintiff is entitled to their possession under the writ of replevin. The judgment is reversed and the cause remanded with directions to enter judgment for plaintiff. All concur.